LLOYD EDWARD KING, JR., Petitioner-Appellant and Cross-Appellee, v. TERRE GAIL KING, Respondent-Appellee and Cross-Appellant.

Fifth District   No. 5—83—0740

Opinion filed January 29, 1985.—Rehearing denied March 1, 1985.

Gerald H. Johnson, of Downs, Johnson & Montgomery, of Cape Girardeau, Missouri, for appellant.

Albert C. Lowes, of Drusch & Lowes, of Cape Girardeau, Missouri, and Catherine R. McBride, of Brown, James & Rabbitt, P.C., of St. Louis, Missouri, for appellee.

PRESIDING JUSTICE JONES delivered the opinion of the court:

This appeal presents the question whether the trial court had jurisdiction to hear the respondent's post-trial motion seeking to supplement a judgment for dissolution of marriage and order adjudicating property rights when the motion was filed over two years after the entry of judgment and alleged that the order was not final because of failure to dispose of part of the parties' marital property. We hold that the trial court lacked jurisdiction to hear the motion.

The petitioner, Lloyd Edward King, Jr., and the respondent, Terre Gail King, were married in 1972. In May of 1978, while the petitioner was an employee of the St. Louis Southwestern Railway Company, he was injured in a collision between one of his employer's trains and one owned by the Missouri Pacific Railroad Company. In July of 1979 he filed his complaint as sole plaintiff in a personal injury suit against the two railroad companies. In October of 1979 the parties separated, and the following month the petitioner sought to have the marriage dissolved. In her "response" to the petition for dissolution the respondent set forth under marital assets, listed in exhibit A, the following:

"6. A cause of action in which the Petitioner is suing the Cotton Belt [St. Louis Southwestern Railroad Company] and Missouri and Pacific Railroad Companies."

During the proceedings for dissolution each party was represented by counsel. On April 2, 1983, a hearing was held by the trial court concerning the disposition of the parties' property. At the beginning of the hearing the trial court asked whether "there [has] been some agreement agreed upon between the parties." Respondent's counsel answered, "Yes, your Honor, we've been negotiating and all the parties have come to what we feel is an equitable agreement." At the conclusion of the hearing the trial court expressly stated that it

would "incorporate into the dissolution the property settlement agreement that the parties have worked out today here in open court." At the courthouse, prior to the hearing, the parties and their attorneys had discussed, for a period of about 1½ hours, matters relating to the disposition of property including the personal injury suit. At the hearing, however, the personal injury suit was not mentioned. The judgment of dissolution of marriage and order adjudicating property rights filed on April 9, 1980, is likewise silent with regard to it.

In general, the order adjudicating property rights provided that the petitioner would pay the parties' debts, amounting to about $28,000, and would receive most of their property, which was modest. The petitioner received a 1975 mobile home measuring 14 by 70 feet, a 1973 International Scout, a 1966 pickup truck, a tractor, and half the property in a small family business. Upon receipt of $2,500 from the petitioner, the respondent was to convey to him her interest in 40 acres of farmland located in Alexander County and valued at approximately $8,500. The respondent also received title to a 1973 Dodge van, half the property in the small family business, and some of the household goods and furniture. As part of the approximately $28,000 in debts, the petitioner paid $2,000 due on the Dodge van.

On April 29, 1982, slightly over two years after the entry of judgment, the petitioner entered into a settlement agreement with the railway companies concerning the personal injury lawsuit. The settlement provided for a "total guaranteed payment" to him of $1,699,800.

On August 31, 1982, the respondent filed a post-trial motion and alternative petition for enforcement alleging that the "Judgment failed completely to address the issue of whether this alleged marital asset was in fact, 'a marital asset' and furthermore, failed completely to dispose of the same" and that

> "this Court is *required* under Chapter 40, Paragraph 503, Illinois Revised Statute [*sic*], 1978 [*sic*], to dispose of the marital property of the parties in a just and equitable manner; that the Judgment of the trial court absent disposal of this significant asset is not a 'final judgment' for purposes of appeal or for purposes of post-trial relief and this Court retains jurisdiction to dispose of the marital asset not previously disposed of; that the valuation of same is now determinable, whereas the same was not available at the time of this Court's purported Judgment."

The respondent asked the trial court to enter a supplemental order

determining whether the settlement of the suit for personal injury was marital property and, if so, disposing of it accordingly. In a second count of the post-trial motion the respondent alleged fraud on the part of the petitioner in having substantially concealed the existence and value of this "marital asset" from her and sought relief accordingly.

In response to the petitioner's motion to dismiss the post-trial motion, an order of the trial court was filed on December 23, 1982, in which the court denied the motion to dismiss as to count I and granted it as to count II. In ruling the trial court found:

"The petition to re-open is premised on two theories; one, that the original Judgment of Dissolution was not final because the Court did not dispose of all the marital assets of the parties, and second, that of post-judgment relief under what used to be known as Section 72, which has been replaced and now is Section 1401 [sic] in the new code of Civil Procedure. 1401 is essentially the same as before. In order to successfully maintain this type of an action after two years from the entry of the judgment there must be an affirmative showing of fraudulent concealment. This was not present in the instant case as evidenced by the fact that the Respondent was aware of this possible marital asset before the judgment. Additionally, with full advise [sic] of counsel of her choice, she did voluntarily participate in the property settlement agreement offered to the Court. To say now that the Petitioner fraudulently concealed this asset is not sustained by the pleadings.

However, Count I of the Petitioner's [sic] Motion does present sufficient facts and pleadings to justify re-opening that part of the Dissolution concerning the Court's duty to divide the marital property pursuant to Section 503(c) of Chapter 40. Ordinarily, a property settlement is binding upon the parties, especially if each had counsel and there was no showing of coercion. Yet, the possibility of such a substantial asset (the alleged 1.8 million dollar personal injury settlement) does require the Court to allow the Respondent to argue that a large portion of the marital property was not disposed of in the Decree of Dissolution, hence the judgment was not final.

The Court cautions that nothing in this ruling should be interpreted nor construed to indicate any opinion as to whether or not the personal injury settlement or any part thereof is marital property."

On July 25, 1983, the respondent filed an amended post-trial motion, adding the following paragraph to both counts:

"9. That the parties' attorneys at the time of the hearing of this matter on or about the 9th day of April 1980 announced to the court that an alleged oral 'settlement' had been reached and announced the alleged terms thereof; that no agreement had been reached or was announced with respect to the petitioner's cause of action; it was not mentioned on the record as incorporated into the Decree of Dissolution; that said asset constitutes such a substantial portion of the marital estate that the alleged settlement and decree failing to include any reference to said asset or dispose of same makes the alleged agreement null and void, unfair, unconscionable, incomplete, contrary to the policy to [sic] the state of Illinois and/or such concealment constitutes a fraud upon this court and[,] as a result thereof, the alleged agreement and/or decree were never final. In the alternative, the facts stated above are sufficient to justify the re-opening of a judgment under the law of the state of Illinois."

The trial court dismissed count II of the amended post-trial motion.

On August 2, 1983, a hearing on the amended post-trial motion was had. The respondent testified that during the negotiations concerning the division of property, which were conducted on the morning of the hearing held on April 2, 1980, she did not make an agreement concerning the lawsuit. She said that her lawyer told her at that time "that if I wanted to pursue it, why didn't I get another lawyer after this and pursue it. That there wasn't anything he could do for me and I asked him why he, why didn't he tell me that all along. Because, it came as a total shock." She said that she and her attorney

"were arguing very violently because I told him that I felt like he was giving me a raw deal. That all of a sudden, you know, it seemed like three [against her, since the petitioner and his attorney likewise maintained that the personal injury lawsuit was not marital property]. If I couldn't depen [sic] on my own lawyer, who could I depend on and I asked him why he didn't tell me all of this before were [sic] to go into court, when I expected this to be part of the divorce."

Asked whether she was "advised to get another lawyer and pursue it after the divorce," she answered, "And that if I didn't go ahead with the divorce and left it up to the Judge, that I would be paying possibly half of the bills from the lawsuit [including attorney's fees

of about $3,700, or possibly as much as $4,500, and money borrowed to cover expenses incurred during the approximately ten months the petitioner did not work after the collision] and I wasn't making but minimum wage at that time." She said that she first learned on April 2, 1980, that she was not a party to the personal injury lawsuit. On cross-examination she testified that her lawyer had told her that

> "as far as he was concerned it wasn't marital property. And, if I wanted to pursue it I could get another lawyer later and we weren't going to put this in the dicorce [sic]. I was against it, I felt like it should have been in the divorce, but I was fighting with my own lawyer, I was fighting with you [counsel for petitioner], and I was fighting with my husband and I felt like if my lawyer and I couldn't agree that there was no point in going on with that situation."

She stated further that she "agreed to get the divorce over. I did not agree that the lawsuit was settled at that time." On the matter of the respondent's understanding this colloquy took place during cross-examination of her:

> "Q. Isn't it true that Mr. Collina [counsel for respondent during the dissolution proceedings] told you on that last date when you obtained the dissolution that if you wanted part of his cause of action or any part of your settlement, you would not be able to obtain the dissolution on that date, that you would have to wait until he received part of that?
>
> A. No sir, he never told me that.
>
> Q. Well, wasn't it your understanding on that last date you would not receive nay [sic] part of his settlement after that date. Did you understand that?
>
> A. No sir, I did not understand that.
>
> Q. You didn't understand that.
>
> A. I understood it was no part of the divorce and it was still pending. It shouldn't have been in it from what Mr. Collina said and you and Buddy [petitioner].
>
> Q. And isn't it true that you assumed on that day that after the divorce if it was granted that day, you would have no interest in any settlement or judgment of Mr. King's later?
>
> A. No sir."

On redirect she testified that no agreement had been made concerning the cause of action for personal injury. Following recross the trial court asked the respondent several questions which she answered as follows:

"THE COURT: Mrs. Penrod [the respondent has remarried], exactly what was your impression of your rights regarding the lawsuit that Mr. Schlicter [counsel for petitioner in the personal injury suit] had filed when you left the courtroom on April the 2nd when the dissolution was completed when you left the courtroom [*sic*]. What was in your mind as to what rights you had in that lawsuit.

MRS. PENROD: I felt like before we came before you that I had a right to part of it because I was married and I also suffered and I took care of Lloyd [petitioner] at that time.

THE COURT: No after the dissolution.

MRS. PENROD: After I left the courtroom, that it was not a part of the divorce and it was not settled that it was not out of the divorce. It was still something that I could maybe take care of later.

THE COURT: But not through the divorce proceeding?

MRS. PENROD: But not through the divorce proceeding. That's how they led me to believe.

THE COURT: You thought it could not be taken care of in the divorce proceedings, is that right?

MRS. PENROD: Right. I did not know until right before the divorce.

THE COURT: Did you ever contact Mr. Schlicter's office after April the 2nd, 1980?

MRS. PENROD: I was told not to.

THE COURT: By whom?

MRS. PENROD: By Mr. King, Lloyd.

THE COURT: Was this after the divorce that he told you not to contact him?

MRS. PENROD: He told me when we came on April the 2nd, he told me not to call Schlicter, that Schlicter did not want to meet and would have nothing more to do with me.

THE COURT: And was this prior to your leaving court? When this conversation took place?

MRS. PENROD: Yes.

THE COURT: How did you follow the progress of the lawsuit after April 2, 1980?

MRS. PENROD: I didn't really, I didn't have any contact with Lloyd and I would never ask his parent. I didn't have any money to pursue it and until I married and talked to my husband about it, that's when he told me he would try to help me with it. Have I answered your question?

THE COURT: Well, if you stated that it was your intent or your understanding when you left the courtroom that you still had some rights regarding the lawsuit, I wanted to find out what effort you made on your behalf to follow the progress, if you thought something was owed to you. What did you do to make sure you got what was coming to you?

MRS. PENROD: Judge Spomer, I didn't have the money to pursue it at any time until I remarried. There was nothing I could do.

THE COURT: Did you remarry after the settlement?

MRS. PENROD: Yes, we did but we had went to see the lawyers.

THE COURT: Did you see somebody in the mean time about how the progress of this lawsuit was coming along?

MRS. PENROD: No.

THE COURT: You weren't curious about it or anything?

MRS. PENROD: Yes, I was curious about it, but I didn't have the money to retain a lawyer myself. I mean, I didn't feel like I could go to a lawyer and say Hey, check this out, I want to know what's going on. I didn't have fifty dollars an hour to give him.

THE COURT: Well, if you didn't contact any attorneys, in the mean time, how did you know how much it would cost to get that advise [*sic*], did you just assume that you would have to have at least the cost?

MRS. PENROD: I know what lawyers cost now, and I knew it would be very expensive and I could barely make ends meet with what I was making.

THE COURT: And the reason you had no contact with Mr. Schlicter's office was that Mr. King told you on April the 2nd, not to contact him?

MRS. PENROD: That's correct.

THE COURT: And you thought you had followed his advise [*sic*] and not contact him. Did you have any idea that it might be to your detriment by not contacting him?

MRS. PENROD: I felt like Jerry Schlicter said that he that, he must have had a reason and I didn't understand why he was so upset with me, that he told me he didn't want anything to do with me, he would not represent me.

THE COURT: But this is coming through your ex-husband's mouth, at that time?

MRS. PENROD: Right.

THE COURT: Thank you."

Testifying in his own behalf, the petitioner testified that during the negotiations on April 2, 1980, he had told the respondent that she "had no part of my injury case that she had her own case. That she could pursue it if she so desired to" and that his attorney in that case "was not representing her because it would be a conflict of interest and that she should retain a [sic] attorney and then she could get the files and paper work on the case so she could pursue her own cause." Asked what his understanding was about his cause of action at the time of the hearing on April 2, 1980, he answered, "That was settled, the cause of action was mine. She held no interest in it, that it was not part of our marriage property or anything."

In view of our disposition we need not set forth those facts adduced at the hearing that relate to the division of the settlement agreement as marital property, including the respondent's testimony concerning the petitioner's pretense of pain, his exaggeration of a limp in public, and his unwillingness to return to work for fear of jeopardizing the success of his personal injury lawsuit. Nor need we address the testimony of the petitioner concerning his transfer to his parents of property, real and personal, acquired by him following settlement of the personal injury suit.

Included as part of the record of the hearing conducted on August 2, 1983, was the deposition of Joseph Collina, the attorney who had represented the respondent during the dissolution proceedings. The deponent had moved to Texas on February 5, 1983. He stated that, based on Illinois law on April 2, 1980, he had determined that the respondent could have no interest in the petitioner's cause of action for personal injury unless its value was established, through settlement or judgment, by the time of dissolution and that until such time as its value, if any, became fixed, the lawsuit was a mere expectancy. The deponent expressed familiarity with the case of *In re Marriage of Gan* (1980), 83 Ill. App. 3d 265, 404 N.E.2d 306, which was filed on March 20, 1980, about three weeks before judgment was entered in the dissolution proceeding with which we are here concerned. In *Gan* we held the proceeds of a settlement of a personal injury suit to be marital property. Indicating that the *Gan* case had been copied for his file from the advance sheet, the deponent said that the case did not alter his view that until the value of such a suit was fixed it could not be deemed marital property because in *Gan* the settlement was reached and, hence, the value fixed, during the course of the marriage prior to its dissolution. He stated further that the husband of another of his clients at about the

same time had been involved in a suit similar to that of the petitioner here, which was being handled by the same law firm, but that a judgment had been rendered in that suit prior to dissolution of the marriage for a sum of $200,000, of which his client received $17,000 as marital property.

On October 19, 1983, the trial court entered a trial memorandum and order, which incorporated the findings of fact and conclusions of law stated in the order of December 23, 1982, and which presented the issues as two-fold: whether the personal injury settlement was marital property and, if so, how it was to be divided. The trial court found that the settlement was marital property. Because the petitioner had received a payment of $500,000 initially, out of which were paid attorney fees and other expenses, which reduced the amount of that money available to him to about $122,000, and because the remainder of the settlement was payable to the plaintiff in monthly installments of $3,333, the trial court was

> "of the opinion that out of the approximate [*sic*] $122,000 the Plaintiff netted initially $25,000.00 should be awarded to Respondent, and payable within 30 days of this order. With regard to the monthly payments (balance), it would seem appropriate to reduce these to a lump sum. Obvious problems would arise if the ex-wife were to receive a percentage of each month's check, therefore, she is awarded the sum of $35,000 as her share of the balance to be paid within 120 days of this order."

The petitioner subsequently brought this appeal, and the respondent a cross-appeal in which she contends that the trial court abused its discretion in awarding the respondent the amount it did, "considering her unselfish contribution to the marital unit for two years following his injury and the petitioner's greed, attempted concealment and dissipation, his lies under oath and his fraudulent transactions involving his parents. This Respondent suggests that an award of at least 40% to the Respondent is necessary."

The petitioner presents two issues for review: whether, as we have already stated, the trial court had jurisdiction to hear the respondent's post-trial motion to supplement the judgment for dissolution of marriage and order adjudicating property rights over two years after its entry for failure to dispose of part of the marital property and whether the petitioner's personal injury settlement, "which accrued during the marriage but [was] received after the dissolution," was properly deemed marital property. In view of our disposition of the first issue the petitioner raises we need not consider

the second issue he raises or that which the respondent presents in her cross-appeal.

The petitioner contends that inasmuch as section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401), providing for relief from judgments, requires a petition for such relief to be filed not later than two years after the entry of judgment, a court lacks jurisdiction to hear such a petition after more than two years have elapsed in the absence of legal disability, duress, or fraudulent concealment. Section 2—1401 provides in pertinent part:

> "(a) Relief from final orders and judgments, after 30 days from the entry thereof, may be had upon petition as provided in this Section.

* * *

> . (c) The petition must be filed not later than 2 years after the entry of the order of judgment. Time during which the person seeking relief is under legal disability or duress or the ground for relief is fraudulently concealed shall be excluded in computing the period of 2 years."

In her brief the respondent maintains that section 2—1401 was "not the basis of the court's assumption of jurisdiction in this action. Rather, the trial court determined that under Chapter 40, sec. 503 of the Illinois Marriage Dissolution Act [sic] it has a duty to determine marital property and to divide the same." In making this assertion, respondent is saying that since the court had not disposed of all the marital property, the order of disposition was not a final one and the court retained jurisdiction of the case irrespective of the lapse of time. Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)) provides in pertinent part:

> "(d) In a proceeding for dissolution of marriage ***, the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors ***."

The respondent relies upon the Missouri case of *Corder v. Corder* (Mo. App. 1977), 546 S.W.2d 798, in which a decree of dissolution that failed to divide all marital property was held not to be a final and appealable order. In *Corder* the court of review stated that one of the goals or purposes of the legislature in enacting the Dissolution of Marriage Act was "to eliminate any carryover of the animosity which brought about severance of the marriage by terminating, without recourse to further litigation, all unity of possession, as

well as unity of title, between the spouses when consummating a 'just' division of 'marital property' " (546 S.W.2d 798, 804-05), which is mandated by the statute. The legislature intended a division of marital property by the court that would effect such a complete severance. "A division of 'marital property' which stops short of severing the relationship attached to the common ownership of property," the court said, " 'should be reserved for the unusual situation where the economics involved call for such a solution.' " (546 S.W.2d 798, 805.) The record in *Corder* failed to reveal any "economics involved" that would justify leaving either the real or personal property comprising the marital property vested in the parties as tenants in common.

Missouri, like Illinois, had adopted the Uniform Marriage and Divorce Act. Our own research, by no means an exhaustive examination of Missouri law on the subject, has disclosed other Missouri cases, decided since the adoption of the Uniform Act, that hold the decree of dissolution not to be a final and appealable order for failure of the trial court to dispose of all of the marital property. For example, in *Nilges v. Nilges* (Mo. App. 1978), 564 S.W.2d 262, 263, the trial court failed, in spite of evidence that the appellant was a beneficiary of a retirement program, to consider a "potentially valuable asset, evaluate and allocate it," as the statute required, and, hence, failed to enter a final, appealable judgment. A similar result was reached in *L.F.H. v. R.L.H.* (Mo. App. 1976), 543 S.W.2d 520, in which the trial court's decree did not divide the real property of the parties, which was, according to the record, the major asset of the marriage.

At the time the judgment in the case at bar was entered, it was entered as final. It was couched in the language of a judgment and intended by the court to be final. The judgment could be said not to be final only upon consideration of circumstances and events that transpired or were discovered after its entry, circumstances and events that do not differ in any significant way from those circumstances and events that have been advanced traditionally and historically as reasons for setting aside a judgment. The court and both of the parties concurred in the entry of the judgment, and for all intents and purposes it was final and constituted the conclusion of the litigation. Nothing further remained to be done at the time. (*Flores v. Dugan* (1982), 91 Ill. 2d 108, 435 N.E.2d 480.) The respondent testified that she disagreed with her attorney as to whether the suit for personal injury was marital property, but she agreed to entry of judgment at the time and to pursue the matter later with a different

attorney of her choice. That, however, she did not do until over two years had elapsed after the entry of judgment. Whether the respondent was advised of the possible consequences of such delay is not a part of the voluminous record before us.

Section 510(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 510(a)) specified with regard to the modification and termination of provisions for maintenance, support, and property division, that "[t]he provisions as to property disposition may not be revoked or modified, *unless the court finds the existence of conditions that justify the re-opening of a judgment under the laws of this State.*" (Emphasis added.) We think that this legislative pronouncement requires that judgments in dissolution proceedings be accorded the same degree or status of finality that is accorded to judgments in other proceedings. Otherwise, the integrity of judgments in dissolution proceedings would be subject to erosion.

As limited by section 510(a) of the Illinois Marriage and Dissolution of Marriage Act, relief "under the laws of this State" from final orders and judgments after more than 30 days have elapsed from their entry, which was the situation in the case at bar, is provided principally under section 2—1401 of the Code of Civil Procedure. That section, however, requires filing of a petition for such relief not later than two years after the entry of the order or judgment in question, but time during which the person seeking relief is under legal disability or duress or the ground for relief is fraudulently concealed is to be excluded in computing the two years. (See *Crowell v. Bilandic* (1980), 81 Ill. 2d 422, 411 N.E.2d 16; *In re Marriage of Emerson* (1983), 115 Ill. App. 3d 712, 450 N.E.2d 987.) There is no suggestion that the respondent here was under any legal disability, the conduct of the petitioner and counsel for both parties cannot be said to have risen to the level of duress, and the trial court expressly found that an affirmative showing of fraudulent concealment was absent by virtue of the respondent's awareness of this "possible marital asset" prior to entry of judgment. Since relief was not sought here until over two years after the entry of judgment, and in the absence of legal disability, duress, or fraudulent concealment of the ground for relief, the trial court lacked jurisdiction to hear the respondent's "post-trial motion." The judgment of the trial court entered regarding the respondent's post-judgment relief must, accordingly, be vacated for lack of jurisdiction. *In re Marriage of Redmer* (1982), 111 Ill. App. 3d 317, 443 N.E.2d 1075.

We would note in passing that the "laws of this State" make

provision for relief from final orders and judgments after 30 days from entry thereof in ways other than that provided by section 2—1401(a) of the Civil Practice Law or alluded to in section 2—1401(c) (petitioner for relief under legal disability or duress, or fraudulent concealment of grounds). However, none of the additional modes of post-30-day relief we now mention were sought to be invoked by the petitioner. Those additional modes of post-30-day relief are found in an application of the revestment doctrine (*cf. Archer Daniels Midland Co. v. Barth* (1984), 103 Ill. 2d 536, 470 N.E.2d 290), where the final order or judgment is void (*cf. In re Application of Dickey* (1978), 72 Ill. 2d 317, 381 N.E.2d 260; *Havlen v. Waggoner* (1981), 92 Ill. App. 3d 916, 416 N.E.2d 684; *Federal Sign & Signal Corp. v. Czubak* (1978), 57 Ill. App. 3d 176, 372 N.E.2d 965), by an agreement of the parties (*cf. Brown v. Miner* (1951), 408 Ill. 123, 96 N.E.2d 530; *Steinhagen v. Trull* (1926), 320 Ill. 382, 151 N.E. 250; *Krotke v. Chicago, Rock Island & Pacific R.R. Co.* (1974), 26 Ill. App. 3d 493, 327 N.E.2d 212), or by a *nunc pro tunc* order (*cf. In re Estate of Young* (1953), 414 Ill. 525, 112 N.E.2d 113; *Moore v. Shook* (1916), 276 Ill. 47, 114 N.E. 592).

In considering the viability of the two-year limitation provided by section 2—1401 of the Civil Practice Law, the supreme court stated in *Crowell v. Bilandic* (1980), 81 Ill. 2d 422, 427-28, 411 N.E.2d 16, 18:

> "We believe, however, that the 2-year limitation mandated by section 72 [section 72 of the Civil Practice Act, Ill. Rev. Stat. 1977, ch. 110, par. 72, the predecessor of section 2—1401] must be adhered to in the absence of a clear showing that 'the person seeking relief is under legal disability or duress or the ground for relief is fraudulently concealed \*\*\*.' (See *People v. Berland* (1978), 74 Ill. 2d 286, 317; *People v. Colletti* (1971), 48 Ill. 2d 135, 137; *Agorianitis v. Ress* (1977), 55 Ill. App. 3d 325, 328; *Marin v. Grimm* (1976), 37 Ill. App. 3d 979.) The purpose of this section's time limitation is a salutary one—to establish necessary stability and finality in judicial proceedings."

Although the *Crowell* case did not involve a property disposition judgment in a marital case, its admonition regarding finality of judgments is nonetheless fully applicable here.

Order vacated.

KARNS and HARRISON, JJ., concur.