# Illinois Official Reports

## Appellate Court

*In re Marriage of Lyman*, 2015 IL App (1st) 132832

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF DEBORAH L. LYMAN, Petitioner-Appellant and Cross-Appellee, and ROBERT E. LYMAN, Respondent-Appellee and Cross-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-2832 |
| Filed | February 2, 2015 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the dissolution of the parties' marriage, the trial court properly dismissed petitioner's amended and second amended petitions filed pursuant to section 2-1401 of the Code of Civil Procedure, and the appellate court reversed the trial court's grant of leave to petitioner to file her second amended section 2-1401 petition and the motion granting sanctions to respondent was vacated and the cause was remanded for a hearing to determine whether respondent should be awarded attorney fees under section 508(a) of the Marriage and Dissolution Act, since petitioner failed to show her proposed amendment would cure the defective pleading, the second amended petition to modify the judgment of dissolution was merely a "cut and paste" of the words used in her first pleading, the record did not support petitioner's claim that respondent concealed his assets, petitioner elected to forego further discovery by accepting a representation and warranty of full and complete disclosure at her own peril, and even though she had the opportunity to negotiate a clause into the settlement agreement requiring respondent to disclose his interest in his businesses, she failed to do so. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-D-7096; the Hon. Mark Lopez, Judge, presiding. |

| Judgment | Affirmed in part, reversed in part, vacated in part, and remanded with directions. |
|---|---|
| Counsel on Appeal | Miller Shakman & Beem LLP (Karen L. Levine and Melissa B. Pryor, of counsel), and Miner Barnhill & Galland, P.C. (George F. Galland, Jr., of counsel), both of Chicago, for appellant. |
| | Lake Toback, of Chicago (Michael G. DiDomenico and Sean M. Hamann, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion. |
| | Justices Cunningham and Connors concurred in the judgment and opinion. |

## OPINION

¶ 1        This divorce case illustrates the difficulty a spouse has in extricating herself from a marital settlement agreement whose terms were, in retrospect, not as generous as she would have liked. Petitioner Deborah Lyman and respondent Robert Lyman entered into a marital settlement agreement (MSA), which was incorporated into a divorce judgment. Deborah filed postjudgment petitions claiming fraud and breach of the MSA pursuant to section 2-1401 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2010)). She argued that she was fraudulently induced to enter into the MSA because Robert informed her that his businesses were ceasing to operate and would lose their value. Robert moved to dismiss Deborah's amended section 2-1401 petition pursuant to sections 2-619(a)(4) and (a)(9) of the Code (735 ILCS 5/2-619(a)(4), (a)(9) (West 2010)). Robert also moved for sanctions against Deborah under Illinois Supreme Court Rule 137 (Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)). The trial court granted Robert's motion to dismiss and motion for sanctions, from which Deborah appeals. For the following reasons, we affirm in part, reverse in part, vacate in part, and remand this matter with directions to the trial court to conduct a hearing to determine whether to award attorney fees to Robert under section 508(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(a) (West 2010)).

BACKGROUND[1]

¶ 3      Deborah and Robert were married on November 6, 1982 and have two adult children. On July 16, 2007, Deborah filed for dissolution of marriage in Cook County.[2] Throughout the divorce proceedings, Robert maintained a 40% ownership interest in Mudd-Lyman Set and Service, LLC; ML Sourcing, Inc.; Mudd-Lyman Sales and Service Corporation; and ML Reset, Inc. (collectively, the Mudd-Lyman entities). His partner, Donald Mudd, owned the remaining 60% interest in the Mudd-Lyman entities. According to Deborah, Robert's interest in the Mudd-Lyman entities represented a substantial portion of the marital estate.

¶ 4      The parties litigated the divorce for more than two years, during which Deborah conducted discovery of third parties and hired multiple experts to value portions of the marital estate. Deborah focused her efforts on obtaining financial discovery related to the Mudd-Lyman entities. She moved numerous times to compel Robert to produce documents concerning the Mudd-Lyman entities.

¶ 5      On February 27, 2008, the parties entered into an agreed order providing that Robert would pay Deborah 50% of his net annual salary on a monthly basis beginning March 1, 2008. The order required Robert to provide proof of his monthly net salary at the time he made each payment. In addition, if Robert received a bonus or distribution other than his salary, the net after-tax amount was to be placed in escrow for distribution at a later date to be determined by written agreement or further order of the trial court.

¶ 6      Also in 2008, Deborah retained an expert to value the Mudd-Lyman entities. The expert had full access to the Mudd-Lyman entities' corporate documents and scrutinized the companies' operations for over 30 days. The assessment completed by Deborah's expert showed that the value of the Mudd-Lyman entities was derived almost exclusively from a contract with Home Depot. The contract with Home Depot accounted for over 90% of the Mudd-Lyman entities' total annual revenue. On May 15, 2008, the expert valued the Mudd-Lyman entities to be worth approximately $38 million. Throughout the divorce proceedings, Robert informed Deborah that the Mudd-Lyman entities' lucrative contract with Home Depot was only temporary and that its expiration would affect both the value of Mudd-Lyman and his future earning capacity.

¶ 7      On November 17, 2008, Deborah moved for leave to subpoena Home Depot to obtain additional information regarding its contract with the Mudd-Lyman entities. She also moved to

---

[1]Robert alleges Deborah's opening brief violates Illinois Supreme Court Rule 341(h)(6) (Ill. S. Ct. R. 341(h)(6) (eff. July 1, 2008)) by intentionally omitting material facts. Robert requests that her brief be stricken and that other sanctions be imposed. Rule 341(h)(6) requires a statement of the facts, with citation to the record, necessary for an understanding of the case. *Id.* This rule is not merely a suggestion, but is necessary for the proper and efficient administration of the courts. *In re Marriage of Kiferbaum*, 2014 IL App (1st) 130736, ¶ 20. Deborah's fact section does indeed contain some material omissions, most notably, the key portions of the MSA at issue on appeal. We were nevertheless able to access those omitted portions in the record. We deny Robert's motion to strike, but we note that our supreme court's rules are not simply hortatory, but are mandatory and are to be scrupulously followed. *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38.

[2]Deborah's verified petition for dissolution of marriage alleges that on July 12, 2005, while both parties were residing in Lake County, Illinois, Robert filed a petition for dissolution of marriage in that county. Deborah alleges that the Lake County proceeding remained pending for two years and was set for trial on November 5, 2007. Robert voluntarily dismissed the Lake County case on July 17, 2007.

redepose Robert about the Home Depot contract. On January 7, 2009, the trial court granted Deborah leave to issue a subpoena to Home Depot.

¶ 8    On January 12, 2009, Home Depot sent a letter to the Mudd-Lyman entities announcing that it would terminate the Home Depot contract effective July 10, 2009. Robert's counsel enclosed this correspondence in a letter to Deborah's counsel, dated January 13, 2009, which stated, "[o]bviously, the termination of the Home Depot contract materially affects the valuation of the various Mudd-Lyman entities in this case."

¶ 9    Deborah nevertheless subpoenaed Home Depot and Donald Mudd, but in light of the expense that would accompany the additional discovery and new business valuations due to the loss of the Home Depot contract, both parties agreed to enter into settlement negotiations. The parties agreed to each submit asset affidavits as accurate statements reflecting their assets for purposes of determining a property settlement and entering into the MSA.

¶ 10    On July 17, 2009, the Mudd-Lyman entities ceased operations. Robert and all other Mudd-Lyman employees received their final paychecks on that date. As settlement discussions continued, the trial court entered an order on August 6, 2009 requiring the parties to supplement their document production on all accounts "such that the same are current through July 2009, on or before August 17, 2009." Also at this time, Deborah stopped receiving the temporary support payments from Robert as required by the February 27, 2008 agreed order. When her counsel inquired as to why the payments ceased, Robert's counsel explained by letters dated August 12, 2009 and August 24, 2009 that Robert was no longer receiving a paycheck from the Mudd-Lyman entities. Robert agreed to bring Deborah a check for the final temporary support payment to their September 2, 2009 court date.

¶ 11    On September 2, 2009, the parties entered into the MSA, which was incorporated into a judgment of dissolution of marriage, entered on the same date. The provisions from the MSA pertinent to this appeal include the following.

¶ 12    Paragraph F in the preamble of the MSA states:

"The Husband has employed and had the benefit of counsel of [Names] as his attorneys. The Wife has employed and had the benefit of the counsel of [Names] as her attorneys. Each of the parties has had the benefit of advice, investigation and recommendations with reference to the subject matter of this Agreement. Although the Wife has not completed depositions of all relevant witnesses, both she and the Husband acknowledge that each has been informed as to the wealth, property, estate and income of the other party as set forth in: (x) the Affidavits By Certification Regarding Assets (the 'Asset Affidavits') provided for in paragraph 8.1 hereof; and (y) a supplemental document production, which the producing party hereby represents to be a complete and accurate update of all of his or her own financial information as well as of financial information regarding accounts held in the name of and/or for the benefit of [their children] William and Natalie (the 'Supplementation'). The Asset Affidavits and the Supplementation are each a condition precedent to the effectiveness and validity of this Agreement. Each party has been informed of his and her respective rights and obligations in the premises, and each party is sufficiently conversant with the property and income possessed by the other and the value thereof in connection with the Asset Affidavits and the Supplementation so as to enter into this Agreement. Further, each party has specifically waived the exercise of: (i) any rights to take additional discovery to the extent not pursued; (ii) any rights to take further steps in connection with

- 4 -

obtaining any updated or further appraisals or valuations of any property held by either of the parties; and (iii) any rights to pursue claims for dissipation or otherwise. Further, the parties have instructed their respective attorneys to take no further measures themselves or through others with respect to the foregoing."

Paragraph G of the MSA's preamble states:

"Each party expressly states that he or she has freely and voluntarily entered into this Agreement of his or her own volition, free from any duress or coercion and with full knowledge of each and every provision contained in this Agreement and the consequences thereof. Each party expressly states that no representation has been made by the other party or the other party's attorney other than that which is contained in: (x) this Agreement, including the Asset Affidavits; and (y) the Supplementation. Each of the parties, after carefully considering the terms and provisions of this Agreement, states that he or she believes the same to be fair and reasonable under the present circumstances."

¶ 13    Article I, section 1.1, of the MSA incorporates the preamble into article I by reference and states that the parties "agree that the Preamble is contractual and not a mere recital and is material to this Agreement." Under article II of the MSA, Robert agreed to pay maintenance to Deborah. Section 2.6 of article II required Robert to give Deborah each year from 2010 to 2015: (1) a sworn certification of his gross income from employment for the preceding calendar year; (2) copies of his federal and state tax returns with all schedules and attachments for the preceding calendar year; and (3) copies of all W-2s, K-1s, and 1099s. In addition, upon Deborah's request, Robert would also provide "true and correct copies of tax returns (with all schedules and attachments), annual financial statements and/or other financial or accounting records for the preceding calendar year of the Mudd Lyman entities."

¶ 14    Article V of the MSA includes the division of "other property" to Deborah, including $1,500,000 in cash, a Morgan Stanley investment account valued at $500,000, and "[t]he exact sum of Four Hundred Seventy-Five Thousand Dollars ($475,000.00) in cash to be delivered by Husband, from accounts held solely in Husband's name, on or before January 15, 2010, by wire transfer to an account designated by the Wife and/or cashier's check(s), which payment may not be reduced by any set-off, offset or recoupment." Section 5.3 of article V states that, with respect to all of the property awarded to Deborah, "the Wife shall fully and forever indemnify and hold Husband harmless for any liability thereon."

¶ 15    Article VII of the MSA, entitled "Other Property to Husband," lists the property to be retained by Robert "free and clear of any and all rights, claims or interest of the Wife *** less the $2,000,000 to be paid to Wife on the Effective Date and the $475,000 to be paid on or before January 15, 2010." The parties agreed Robert would retain 100% of his interest in the Mudd-Lyman entities as his property.

¶ 16    Article VIII of the MSA addresses the asset affidavits and supplementation completed by the parties. Under section 8.1 of article VIII, each of the parties "represents and warrants to the other party that he or she has made a full and fair disclosure to the other party of his or her material property and interests and the value thereof (net of liabilities other than tax liabilities) that are held solely in his or her name or held (in trust or otherwise) for his or her benefit, regardless of whether such property or interests are marital, non-marital, or expectancy." Section 8.1 specifically states that Robert "need not disclose the value of his interests in the Mudd Lyman Entities." This section also required Robert to declare in his asset affidavit "that

- 5 -

neither he, nor his designee or assignee, nor any of the Mudd Lyman Entities has entered into an agreement or other arrangement to sell, encumber or transfer any of the Mudd Lyman Entities, a substantial portion of the assets of any of them, or any of Husband's interests in any of the foregoing, and that none of them are soliciting or negotiating the sale, encumbrance or transfer of any of the foregoing." Section 8.1 continues:

> "[P]rior to the execution of this Agreement, and as a condition precedent to its effectiveness and validity, the parties have provided to each other the Supplementation, which provides the values for the property and interests set forth in the Asset Affidavits and updates each party's respective document production pursuant to an Order of Court entered August 6, 2009. Further, each party understands and acknowledges that the other party has specifically relied on and has entered into this Agreement based on the other party's Supplementation, Asset Affidavit and statements contained therein and herein. Further, by executing this Agreement, each party represents and avers that there has been no material change in his or her assets between when his or her Asset Affidavit was executed and his or her Supplementation was produced, on the one hand, and the date of execution and the Effective Date, on the other hand."

¶ 17    In Article XIV, section 14.2, the MSA states that each party "covenants and agrees for himself or herself *** that in the event any suit shall be commenced in violation of this release, this release, once pleaded, shall be and constitute a complete defense and bar to any such claim or suit so instituted by either party hereto," but "nothing herein contained shall operate or be construed as a waiver or release by either party of any obligation of the other party to comply with the express provisions of this Agreement, or the rights of either party under this Agreement." Section 14.7 sets forth that the MSA was jointly drafted and that each of the parties "acknowledges that he or she has had the benefit of the advice of counsel of his or her own choice in negotiating, drafting and executing this Agreement, and the language in all parts of this Agreement is the product of efforts of both counsel." Therefore, neither the entire MSA nor any provision in it "shall be *** construed against any party." Further, section 14.7 states, "[e]ach party acknowledges that, together with his or her attorneys, he or she made such investigation of the facts pertaining to this settlement and this Agreement, and of all the matters pertaining hereto, as he or she deems reasonably necessary."

¶ 18    Robert certified "[u]nder penalties provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure (735 ILCS 5/1-109)" that the statements contained in the asset affidavit "are true and correct, except as to matters therein stated to be on information and belief." His asset affidavit listed "the material assets and liabilities" held in his name, on his behalf, or under his control, "exclusive of any assets held jointly" by Deborah and himself, which included 40% ownership of the Mudd-Lyman entities.[3] Robert acknowledged that he: (1) was not selling the Mudd-Lyman entities; (2) had no claim against Donald Mudd; and (3) had not entered into any agreement with Mudd with respect to "selling, encumbering, transferring, recovering, returning, repaying or reimbursing (or forbearing to do any of the

---

[3]Deborah's opening brief states that Robert "swore in his Asset Affidavit that he had disclosed all of his assets, *including expectancies*." (Emphasis added.) In support of this statement, she cited to the first page of Robert's asset affidavit, located in the record on appeal. Nowhere on that page does it state that Robert certified he disclosed his expectancies. It instead states that the material assets are "of the date set forth below," referring to the September 2, 2009 date on which the parties executed the MSA and asset affidavit.

- 6 -

foregoing) any monetary sums, property or other assets of any kind." Robert also certified that as of July 17, 2009 through the September 2, 2009 effective date of the MSA, he had not received any paycheck or any other form of income from the Mudd-Lyman entities. Article VIII, section 8.1, of the MSA did not require Robert to list the amount of money in any account of the Mudd-Lyman entities. Most significantly, neither Deborah nor her counsel requested the current account balances of these companies when she executed the MSA.

¶ 19 The trial court also conducted a hearing on September 2, 2009 to prove up the MSA. Deborah testified that she entered into the MSA with Robert. She confirmed that the MSA constituted the entire agreement with him regarding their dissolution of marriage. Deborah agreed that Robert's asset affidavit made a full and fair disclosure of all the property held solely in his name. She understood that Robert was not required to provide the value of the Mudd-Lyman entities, as evidenced by the affirmative response she provided to her counsel when asked, "[a]nd with the exception of real property that each of you own and certain interests that Robert owns in what we have referred to throughout this case as the Mudd Lyman (phonetic) Entities, this supplementation provides the values for these assets that are on the asset affidavits, is that correct?" Deborah testified that before entering into the MSA, her counsel explained to her all of her rights and the range of what she could expect to receive if she continued the divorce litigation. She stated that she voluntarily entered into the MSA and she believed the MSA was fair. Deborah agreed that she had been advised of all of her rights, including to litigate this case to trial without entering into the agreement and that she believed it was in her best interest to enter into the agreement.

¶ 20 Deborah also stated that she conducted discovery and hired experts to assist in valuing certain properties. Deborah stated that she was satisfied that she had sufficient information to enter into the MSA. She acknowledged that she would be receiving, among other things, $475,000 in cash from Robert on or about January 15, 2010. Deborah testified that she was aware Robert would receive 100% of his interest in the Mudd-Lyman entities.

¶ 21 Robert also testified regarding the MSA. After Robert's counsel questioned him, counsel for Deborah stated, "I have no questions."

¶ 22 After the parties testified, the trial court stated that this matter "comes before the Court as a stipulated matter." The court made numerous factual findings as to jurisdiction, residency, the parties' two children, and the grounds for divorce. The court stated that it had the opportunity to review the MSA and found that "the terms are fair, reasonable, and not unconscionable, and that the parties have entered into the agreement freely and voluntarily." The court ordered a judgment of dissolution of marriage, incorporating the MSA into the judgment.

¶ 23 As a result of the Home Depot contract termination, Robert received his 2009 year-end distribution in September instead of in December. The accountants for the Mudd-Lyman entities recommended the earlier distribution because Mudd Lyman Set and Service was closing due to the loss of the Home Depot contract.

¶ 24 On October 15, 2010, Deborah filed a verified petition for breach of the marital settlement agreement within the then-closed divorce case, alleging that Robert had breached the MSA by failing to disclose certain monetary amounts held by the Mudd-Lyman entities, including approximately $4 million in cash in Mudd-Lyman's bank account. According to Deborah, the 2009 general ledger from the Mudd-Lyman entities showed that as of August 31, 2009, the companies had $3,992,229 in cash in a Bank of America account. She alleged that pursuant to article II, section 2.6, of the MSA, Robert provided her with his income tax returns for the 2009

calendar year. She then learned that Robert earned over $2 million in income from his employment with the Mudd-Lyman entities that year. Deborah alleged that the 2009 general ledger showed that the companies had more than $9 million in cash on hand as of September 30, 2009. She asserted that the monthly payroll for officers of Mudd-Lyman between March and July of 2009 was just $54,521.16 and that there was no monthly payroll for officers in August. Deborah alleged that the funds Mudd-Lyman used to pay over $4.3 million to its officers in September, including the approximately $1.7 million distribution Robert received, represented net proceeds from business conducted before September 2, 2009. She contended that Robert and other Mudd-Lyman officers agreed to withhold the distributions until after the divorce was finalized. Deborah sought compensatory and punitive damages.

¶ 25 On January 26, 2011, Robert filed a combined motion to dismiss Deborah's verified petition for breach of the marital settlement agreement under sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619, 2-619.1 (West 2010)). Robert argued that Deborah's petition did not state a cause of action for breach of the MSA. Robert asserted that the MSA did not obligate him to disclose the value of his interests in the Mudd-Lyman entities as of the date of the judgment on September 2, 2009.

¶ 26 According to Robert, Deborah and her attorneys were aware of each and every asset under his name and every asset owned by the Mudd-Lyman entities after having conducted voluminous discovery for over two years. In response to Deborah's allegation that the Mudd-Lyman entities had a substantial amount of cash as of August 31, 2009, Robert argued that Deborah could have served a discovery request for him to bring a bank statement to prove up the current amount held by the companies on September 2, 2009, but she chose not to do so. Robert received his distribution check in the amount of $1,734,475.21 on September 30, 2009. After taxes, the net amount of the distribution was $1,084,914.24. Robert argued that Deborah received $475,000 of this amount pursuant to the MSA. Robert stated that both parties knew that he would receive a distribution for 2009, "but the exact amount was unknown." The parties agreed that Deborah would receive $475,000 on January 15, 2010, regardless of the actual amount paid. In other words, Robert argued that even taking the allegations of her petition as true, Deborah received 44% of the net distribution paid to him in 2009 by virtue of the special January 15, 2010 MSA distribution of $475,000. Robert contended Deborah and her attorneys were well aware that substantial funds were accumulating because, at the relevant time alleged (between July 17 and September 2, 2009), Mudd-Lyman Set and Service continued to receive payments from Home Depot on 60-day payment terms. Work performed in June would be paid in August and work performed in July would be paid in September. When the last payments were made in September, the officers of the Mudd-Lyman entities received their payments and the companies closed.

¶ 27 On March 25, 2011, the trial court dismissed Deborah's petition for breach of the marital settlement agreement with prejudice based on Code section 2-615. The order stated that it did not rule on Robert's motion based on Code section 2-619.

¶ 28 Deborah did not immediately appeal from the March 25, 2011 order. Instead, on April 22, 2011, she filed a petition to modify the judgment of dissolution pursuant to Code section 2-1401 (735 ILCS 5/2-1401 (West 2010)). Deborah alleged Robert perpetrated a fraud in connection with the MSA by certifying that he made a full and fair disclosure of all his assets in his asset affidavit. She alleged that Robert knew at the time he executed his asset affidavit and the MSA that he was about to receive a substantial distribution for services performed during

the marriage and failed to disclose this information. She also alleged that Robert failed to disclose the $4 million in cash in the Mudd-Lyman bank account, in which he held a 40% interest. She sought a modification of the judgment of dissolution of marriage to modify the property settlement for purposes of receiving an equitable distribution of the assets Robert allegedly concealed. Deborah's section 2-1401 petition made no mention of her earlier petition for breach of the marital settlement agreement by way of footnote, reincorporation, or re-allegation.

¶ 29     On June 2, 2011, Deborah moved for leave to file an amended section 2-1401 petition *instanter* to add a second count alleging fraud for Robert's purported failure to disclose assets related to the existence of two other companies in which he held an interest, Deck Parts Distributing, Inc., and Deckccessories, Inc. The attached amended pleading also did not reference or adopt the claims from Deborah's initial petition for breach of the marital settlement agreement. By agreed order of June 18, 2011, Deborah was granted leave to file this amended section 2-1401 petition.

¶ 30     On July 13, 2011, Robert filed a combined verified motion to dismiss the amended petition and for sanctions under Illinois Supreme Court Rule 137 (Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)). He sought dismissal of Deborah's amended section 2-1401 petition based on Code sections 2-615, 2-619(a)(4), and 2-619(a)(9). Robert argued the amended section 2-1401 petition failed to state a fraud claim because pursuant to article VIII, section 8.1, of the MSA, he was not required to disclose the value of his interests in the Mudd-Lyman entities. Therefore, he had no duty to provide an updated value of the account. Robert also argued that Deborah failed to show she acted with due diligence under section 2-1401 because she reasonably could have discovered the amount of money in the Mudd-Lyman bank account before the September 2, 2009 judgment. Relying on section 2-619(a)(4), Robert argued that under the doctrine of *res judicata*, Deborah was barred from bringing any claims that were already resolved by the MSA, which was incorporated into the judgment for dissolution of marriage. Alternatively, Robert argued that if the trial court did not conclude the terms of the asset affidavit constituted grounds for dismissal under section 2-619(a)(4), then section 2-619(a)(9) should apply because Deborah's claims are "barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010).

¶ 31     Robert also sought sanctions under Rule 137 because Deborah appended redacted settlement correspondence dated August 12, 2009 and August 24, 2009 from his attorneys to her section 2-1401 petition. He alleged that Deborah's counsel "white[d] out" substantial portions of the correspondence to disguise inadmissible settlement correspondence and to deliberately mislead the court by quoting the remaining passages out of context. Robert argued that Deborah's counsel misled the court by redacting the correspondence to imply the Mudd-Lyman entities withheld the distribution of the remaining cash. He sought the attorney fees incurred to defend against the amended section 2-1401 petition.

¶ 32     Robert's motion to dismiss contained an affidavit, in which he declared:

> "Although I had received my final paycheck [on July 17, 2009], I knew that I would be receiving a 2009 distribution from Mudd-Lyman as a 40% owner when I entered into the Marital Settlement Agreement. However, I did not know the amount of the distribution and thought I would not receive it until December because this is when I received my year-end distributions in the past. Deborah and her attorney were both informed that I would be receiving a distribution in 2009. As a result, I agreed to pay

- 9 -

Deborah $475,000 of my 2009 distribution in January 2010 regardless of the amount of the 2009 distribution or when it would be given to me in exchange for the company. Neither Deborah nor her attorney asked me the amount of my 2009 distribution.

* * *

In sum, Deborah was fully aware of Mudd-Lyman's finances and my finances at the time of the Marital Settlement agreement. I never intended to deceive Deborah. I informed her of all facts and events that could affect the value of Mudd-Lyman. Thus, at the time of the Marital Settlement Agreement, Deborah knew everything that I knew in regards to the value of Mudd-Lyman."

¶ 33    In Deborah's response, she argued that Robert's affidavit "was a lie." She argued that she reasonably relied on Robert's asset affidavit because he "lulled her into believing that all his income from Mudd-Lyman ceased in July 2009, after he received his final paycheck." According to Deborah, Robert sought to avoid receiving income in July and August so that he would not have to share it with her. Deborah argued that the well-pled facts of her section 2-1401 petition were supported by Robert's admission that he knew he and his partner would distribute the remaining monies of the company in the third quarter of 2009 and that the $1.7 million distribution Robert received bolstered her fraud allegations. She also contended that Robert's argument regarding what she and her attorneys were aware of fell outside of the well-pleaded allegations in her section 2-1401 petition. In addition, Deborah argued the $4 million cash in the Mudd-Lyman bank account constituted retained earnings that should be considered as marital property to be evenly distributed among the parties. Finally, Deborah argued that Rule 137 sanctions were unwarranted because, although the subject correspondence contained inadmissible settlement negotiations, the unredacted portions were evidence of Robert's bad-faith misrepresentations about his Mudd-Lyman income.

¶ 34    Deborah attached a counteraffidavit to her response in which she declared that, contrary to what Robert stated in his affidavit, he "never disclosed to me prior to entry of the Judgment of Dissolution that he was about to receive from the Mudd-Lyman Entities a significant distribution of income earned during the marriage." She also declared that Robert "never disclosed to me prior to the entry of the Judgment of Dissolution that the Mudd-Lyman Entities had received–or had the right to receive–income from Home Depot between July and September 2009 for work done during the marriage."

¶ 35    On December 19, 2011, the trial court granted Robert's motion to dismiss in part pursuant to section 2-619(a)(4) (as it related to the claims involving the Mudd-Lyman entities) and denied the remainder (as to the Deck Parts Distributing and Deckccessories entities). The court made numerous findings with regard to the MSA, including that "the parties agreed that Robert did not have to disclose the updated value of the Mudd Lyman bank account nor did Robert have to disclose the value of his interest in the Marital Settlement Agreement." The court held that Robert's motion to dismiss under section 2-619(a)(4) was well pled. Quoting *Brockmeyer v. Duncan*, 18 Ill. 2d 502, 505 (1960), the court stated that section 2-1401 " 'does not afford a litigant a remedy whereby he may be relieved of the consequences of his own mistakes or negligence.' " Furthermore, the court found that " 'to set aside a judgment based on newly discovered evidence, it is quite settled that the evidence must be such as could not reasonably have been discovered at the time of or prior to the entry of the judgment,' " quoting *In re Marriage of Travlos*, 218 Ill. App. 3d 1030, 1035 (1991). According to the court, the record showed Robert fully disclosed his interest in the Mudd-Lyman entities during the pendency of

the proceedings. The court found that, "although Robert was not aware of when he would receive a distribution from his Mudd Lyman Services from Home Depot for 2009 and the exact sum of the distribution, both parties were aware that Robert would receive a distribution from Mudd Lyman for 2009 post-decree and these facts were known to both parties pre decree resulting in the parties negotiating an additional $475,000 payment to [Deborah] by January 15, 2010." In addition, the court noted that both parties "were free to obtain updated information if they had chosen to and both parties elected not to do so." The court also noted that the parties had the option of waiting until receipt of the funds and the exact dollar amount of the distribution was known, but the parties chose not to wait.

¶ 36    Pertinent to this appeal, the trial court also concluded:

"[Deborah] argues that the Court cannot resolve disputed questions of facts on a motion to dismiss. The Court agrees. However, the mere fact that [Deborah] argues that the $475,000.00 settlement payment negotiated between the parties was not related to the Mudd Lyman distribution payment post-decree, is unsupported by the record. The Court finds that [Deborah's] mere denial that the $475,000.00 payment was not related to the Mudd Lyman post-decree distribution from Home Depot fails to establish a question of fact. The record shows that pursuant to paragraph 7.1 of the Marital Settlement Agreement, the parties agreed that Robert would pay [Deborah] the sum of $2,000,000 pursuant to Article 5.1(a) and 5.1(b) of the Marital Settlement Agreement and an additional $475,000 payment to [Deborah] on or before January 15, 2010. Paragraph 7.1(a) clearly states that in return for those payments, Robert would be awarded 100% of his interest in the Mudd Lyman entities. [Deborah] agreed to accept an additional payment of $475,000.00 post-decree from the distribution Robert would ultimately receive from Mudd Lyman for their work from Home Depot. [Deborah's] allegation that Robert failed to disclose income earned in 2009 from Mudd Lyman on his asset affidavit is not supported by the record."

In short, the court found Deborah's argument regarding the $475,000 she received postjudgment and the dispute over whether it was in exchange for the final distribution from the Home Depot contract did not raise an issue of fact precluding judgment because her contention was unsupported by the record. The court entered and continued Robert's motion for Rule 137 sanctions for further proceedings.

¶ 37    On June 27, 2012, Deborah moved for leave to file a second amended petition to modify the judgment of dissolution pursuant to section 2-1401. She sought to resurrect her claim for breach of the MSA from the first postjudgment pleading that the trial court dismissed on March 25, 2011. On August 3, 2012, the trial court denied her leave to amend without prejudice and set the matter for case management.

¶ 38    Deborah moved to reconsider the August 3, 2012 order, arguing that the court's ruling misapplied Illinois law and that she be allowed to reassert her previous claim to preserve the issue for appellate review. Deborah contended that in order to seek appellate review of a dismissed claim, she need only assert the claim in the final amended pleading before appeal. Robert argued that Deborah forfeited her claim for breach of the MSA on appeal because she failed to include it in her subsequent pleadings following the March 25, 2011 dismissal. The court shifted from its earlier denial, granted Deborah's motion, and found that it made an error of law in denying Deborah's motion for leave to file a second amended petition.

¶ 39     On October 9, 2012, Deborah filed her second amended petition to modify the judgment of dissolution pursuant to section 2-1401 and, alternatively, for breach of the MSA, which included similar allegations from her previously filed section 2-1401 petition and for the first time reincorporated her claim from the first postjudgment pleading. Count I alleged fraud in which Deborah asserted, among other things, that "[b]y submitting the Asset Affidavit and certifying that it was a complete and accurate representation of his assets without including the September 2009 distribution or the money on hand in the Mudd Lyman Bank of America account, Robert made false statements of material fact under oath" and "misled Deborah by averring in his Asset Affidavit that he received no income from the Mudd Lyman entities from July 17, 2009 through September 2, 2009." She alleged Robert knew he was submitting false information and that he did so in order to induce her to enter into the MSA. Deborah alleged she justifiably relied on the asset affidavit "as set forth in Paragraph 8.1 of the MSA and, to her detriment, agreed to the MSA." Count II alleged fraud as with regard to Robert's interests in Deck Parts and Deckccessories. Deborah realleged the exact same breach of the MSA claim in count III that she had alleged in her first postjudgment pleading. She attached an affidavit to her second amended petition in which she acknowledged the parties agreed in the MSA that Robert "was not obligated to 'disclose the value of his interests in the Mudd Lyman entities,' " quoting article VIII, section 8.1, of the MSA. She declared in the very next sentence of her affidavit, "[h]owever, this provision did not mean that Robert was not required to disclose the rights he had to income and distributions from Mudd Lyman in 2009."

¶ 40     On October 30, 2012, the trial court dismissed counts I and III of Deborah's second amended section 2-1401 petition with prejudice. The written order does not expressly provide a statutory basis for the dismissal of these counts. The court stated that its ruling on Robert's motion for Rule 137 sanctions remained pending and that upon ruling on that matter, count II of the second amended section 2-1401 petition would be dismissed without prejudice with leave to refile. The court ordered the parties to submit briefs regarding the sanction issue.

¶ 41     The trial court granted Robert's motion for sanctions on March 21, 2013. In a written order, the court stated that Deborah's argument against sanctions "wholly fails to address whether or not attaching and submitting redacted documents to the Court to emphasize only the portions of the correspondence that [Deborah] wishes the Court to consider, while keeping the Court in the dark about the entire contents of the documents, whether or not such action is appropriate and sanctionable under Illinois Supreme Court Rule 137." The court found the August 12, 2009 and August 24, 2009 letters attached to Deborah's amended petition to modify the judgment of dissolution pursuant to section 2-1401 were "other papers" as defined by Rule 137. The court found that "attaching documentation which redacts certain text to allow the Court to view only passages which [petitioner] wants the Court to consider while prohibiting the Court's review of *all* of the text of the subject document to allow the Court to reach its own conclusion, is not well grounded in fact and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." (Emphasis in original.) The court also found that Deborah's submission of the redacted correspondence was done for an improper purpose. The court ordered Robert to file a petition for the attorney fees and costs incurred.

¶ 42     On April 5, 2013, Deborah, through additional counsel, moved to reconsider the trial court's sanction order. The memorandum in support of the motion for reconsideration argued that: (1) Deborah's counsel acted properly in redacting potentially inadmissible material; and (2) the record provided no basis for the finding of improper purpose by her counsel. In support

of the motion, Deborah's attorney submitted a lengthy affidavit explaining the reasons for attaching the redacted versions of the subject correspondence to the amended section 2-1401 petition. The attorney declared that she redacted the two letters "because most of the material they contained was relevant to the ongoing settlement negotiations, including certain provisions making particular offers, but was entirely irrelevant to the two statements that contained the representations about Robert's paycheck from Mudd Lyman that in my view supported our contention that Robert had committed fraud. I believed that the statements about Robert's paycheck supported Deborah's contention that Robert had fraudulently concealed his imminent expectation of a very large payment from Mudd Lyman, and that they were not covered by [Illinois Supreme Court] Rule 408 at all." According to the attorney, Robert's counsel provided copies of the unredacted correspondence to the trial court in order to rule on the sanctions motion.

¶ 43    The trial court heard argument on Deborah's motion to reconsider on April 23, 2013. The court found no error in its application of the law and denied the motion. The court stated that it gave the parties "the benefit of the doubt that if there is a legal basis to submit a settlement agreement for discussions of settlement, [the court] did not sanction." The court noted that the parties submitted the unredacted versions of the correspondence to compare the two, which "misse[d] the point that [Rule] 137 deals with the initial filing. The moment it is filed with the clerk's office and sent to counsel, that's where the material is. The fact that you might be able to clear it up or explain it away later whether it supports an issue of fraud or it doesn't, that's not the point."

¶ 44    On August 2, 2013, the trial court granted Robert's petition for attorney fees as a sanction in the sum of $6,300 and entered judgment thereon. Deborah filed a timely notice of appeal from the dismissal of her second amended section 2-1401 petition and the sanctions. Robert cross-appealed, contesting the October 4, 2012 order granting Deborah leave to file her second amended section 2-1401 petition.

¶ 45                                            ANALYSIS

¶ 46    Deborah alleges numerous errors on review. She argues that the court erred when it found as a matter of law that the September 30, 2009 final distribution was an asset of the Mudd-Lyman entities. Next, she contends the court improperly accepted Robert's allegations that contradicted her well-pled facts, which improperly converted his section 2-619 motion to dismiss into a summary judgment motion. Deborah asserts the court improperly determined it could decide a fraud claim based only upon the terms of the MSA. She also argues that she satisfied the due diligence requirement to establish her section 2-1401 petition. In addition, Deborah contends the court erred when it dismissed her petition for breach of the MSA. Finally, she asserts the court abused its discretion by imposing Rule 137 sanctions.

¶ 47    In his cross-appeal, Robert argues that the trial court improperly reconsidered its denial of leave for Deborah to make a second amendment to her section 2-1401 petition to reincorporate a previously forfeited claim. He asserts that Deborah forfeited her breach of the MSA claim after it was dismissed on March 25, 2011 because she failed to reallege the dismissed count in her subsequently filed section 2-1401 petition. Robert contends that the court abused its discretion by applying Code section 2-616 (735 ILCS 5/2-616 (West 2010)) when ruling on Deborah's motion to reconsider. We initially address the cross-appeal.

¶ 48          Allowing Leave to Reallege Breach of MSA Claim in Final Pleading

¶ 49      Robert argues that the trial court was correct when it originally denied Deborah's motion for leave to file her second amended section 2-1401 petition. Robert asserts that Deborah has forfeited the breach of contract claim by failing to reallege the dismissed count in her initial section 2-1401 petition. He contends that by filing multiple subsequent pleadings that did not reference her first pleading and entering into agreed orders for amendments not containing her first pleading, Deborah has forfeited any claim of error relative to that dismissal. In addition, Robert argues that the court abused its discretion by improperly applying Code section 2-616 to Deborah's motion to reconsider.

¶ 50      Deborah responds that, although she did not include her claim for breach in the two interim section 2-1401 petitions, she did incorporate the claim, with leave of the trial court, as count III in her second amended section 2-1401 petition, which was her final pleading before appeal. Deborah argues including the breach claim in her final pleading was all that was required to preserve the issue for review, citing *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669 (2010).

¶ 51      We address the application of section 2-616 first because it is dispositive. Section 2-616(a) provides that "[a]t any time before final judgment amendments may be allowed on just and reasonable terms," which includes changing the cause of action in any pleading "which may enable the plaintiff to sustain the claim for which it was intended." 735 ILCS 5/2-616(a) (West 2010). Although courts in Illinois are encouraged to freely and liberally allow the amendment of pleadings, the right to amend is not absolute and unlimited. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 467 (1992). The decision of whether to grant leave to amend a pleading rests within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7 (2004). Pursuant to section 2-616(a), a court considers four factors in determining whether to permit an amendment to the pleading, including whether: (1) the proposed amendment would cure a defective pleading; (2) the proposed amendment would surprise or prejudice the opposing party; (3) the proposed amendment was timely filed; and (4) the moving party had previous opportunities to amend. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "The plaintiff must meet all four factors, and 'if the proposed amendment does not state a cognizable claim, and thus, fails the first factor, courts of review will often not proceed with further analysis.' " *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 220 (2010) (quoting *Hayes*, 351 Ill. App. 3d at 7). Where it is apparent even after amendment that no cause of action can be stated, leave to amend should be denied. *Hayes*, 351 Ill. App. 3d at 7; *Ruklick v. Julius Schmid, Inc.*, 169 Ill. App. 3d 1098, 1111 (1988).

¶ 52      In this case, Deborah has not shown that her proposed amendment would cure a defective pleading. A side-by-side comparison of Deborah's October 15, 2010 verified petition for breach of the marital settlement agreement and count III of the October 9, 2012 second amended petition to modify the judgment of dissolution pursuant to section 2-1401 shows that she merely cut and pasted the exact wording of her first pleading into her final pleading. The petition for breach of the MSA was dismissed on March 25, 2011 for failure to state a claim under section 2-615. Petitioner was not trying to change her cause of action or claim a new cause of action under section 2-616(a). She simply reasserted a claim that had already been dismissed for failure to state a cause of action without changing a thing. She sought to add count III to her second amended section 2-1401 petition to technically preserve the claim for

appellate review, as she admits in her reply brief. However, Deborah has not cited to any case law, nor can we find any, holding that an amendment to a pleading cures a defect merely because it preserves an issue for appellate review. Deborah seeks to intertwine the issue of whether she preserved an issue for review with whether she could properly amend her section 2-1401 petition. For procedural purposes, first Deborah needed to overcome the hurdle of meeting the necessary requirements to amend her section 2-1401 petition. If she met those requirements, then we could move to the next stage of the discussion to determine whether that issue is preserved for appellate review. See, *e.g.*, *Helping Others*, 406 Ill. App. 3d at 680 (" 'allegations in former complaints, *not incorporated in the final amended complaint*, are deemed waived' " (emphasis in original) (quoting *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 155 (1983))). Here, we cannot reach this analysis because count III of Deborah's second amended section 2-1401 petition does not cure any defect from her initial petition for breach of the MSA and, therefore, she has not satisfied section 2-616(a). 735 ILCS 5/2-616(a) (West 2010); see also *Charleston v. Larson*, 297 Ill. App. 3d 540, 555-56 (1998) (holding the plaintiff was not entitled to opportunity to amend her pleading after section 2-615 dismissal of claim when the proposed amendment did not cure the defective pleading); *Winfrey v. Chicago Park District*, 274 Ill. App. 3d 939, 947-49 (1995) (no amendment allowed where the plaintiff's third amended complaint suffered from the same deficiencies as the second amended complaint and contained bare allegations and conclusions supported by no facts). We find that the trial court abused its discretion by allowing Deborah leave to amend her second amended section 2-1401 petition to include count III. We reverse on this issue. We now turn to the merits of Deborah's appeal.

¶ 53                                    Standard of Review

¶ 54      The trial court dismissed Deborah's second amended section 2-1401 petition to modify the judgment of dissolution without including a statutory basis in the written order. It appears from the record, however, that the court granted Deborah leave to file the second amended petition as a mere formality for purposes of reincorporating the previously dismissed breach of the MSA claim, with the aim of dismissing the entire petition for the reasons stated in its December 19, 2011 written order, which granted Robert's motion to dismiss pursuant to section 2-619(a)(4).

¶ 55      Judgments for dissolution of marriage are afforded the same degree of finality as judgments in any other proceeding, even where they incorporate a marital settlement agreement. *King v. King*, 130 Ill. App. 3d 642, 654-55 (1985). In order to challenge the validity of an MSA beyond 30 days of the entry of judgment, a party must bring a petition pursuant to section 2-1401 or other method of postjudgment relief. *In re Marriage of Himmel*, 285 Ill. App. 3d 145, 149-51 (1996). The purpose of a section 2-1401 petition is to bring before the court facts not appearing in the record, which, if known at the time of the entry of judgment, would have prevented its rendition. *In re Marriage of Broday*, 256 Ill. App. 3d 699, 705 (1993). "Courts apply this section with the aim of achieving justice, not to give the litigant 'a new opportunity to do that which should have been done in an earlier proceeding' or to relieve the litigant 'of the consequences of his mistake or negligence.' " *Id.* (quoting *Travlos*, 218 Ill. App. 3d at 1035).

¶ 56      "To be entitled to relief under section 2-1401 of the Code, the petitioner must set forth specific factual allegations showing the existence of a meritorious claim, demonstrate due

diligence in presenting the claim to the circuit court in the original action, and act with due diligence in filing the section 2-1401 petition." *In re Marriage of Goldsmith*, 2011 IL App (1st) 093448, ¶ 15. Section 2-1401 requires the petitioner to bear the burden of establishing her right to relief. *Id.* "To set aside a judgment based on newly discovered evidence, the petitioner must show the new evidence was not known to her at the time of the proceeding and could not have been discovered by the petitioner with the exercise of reasonable diligence." *Id.*

¶ 57 A motion to dismiss a section 2-1401 petition is reviewed under the same standards as any motion to dismiss a pleading. *In re Marriage of Reines*, 184 Ill. App. 3d 392, 404 (1989). Here, Deborah asserts the trial court erred in granting Robert's motion to dismiss her second amended section 2-1401 petition pursuant to Code section 2-619. *In re Marriage of Streur*, 2011 IL App (1st) 082326, ¶ 27. We review *de novo* the trial court's decision to grant Robert's motion to dismiss under section 2-619. *Id.*

¶ 58                                    The Contested September 30, 2009 Distribution

¶ 59 Deborah first argues that the trial court erred when it found as a matter of law that the September 30, 2009 distribution was a Mudd-Lyman asset as opposed to Robert's income. As a result of this finding, Deborah contends the court improperly found Robert had no duty to disclose this distribution under article VIII, section 8.1, of the MSA, which states that Robert was not required to disclose the value of his interest in the Mudd-Lyman entities. She asserts the distribution should be considered retained earnings, which is a fact-intensive determination that necessitated the denial of Robert's section 2-619 motion to dismiss. She cites *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 503-04 (2009), and *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶¶ 79-81, in support of her argument.

¶ 60 In *Lundahl*, the petitioner husband contested the trial court's reclassification of the retained earnings of his company from nonmarital property to marital property pursuant to section 503 of the Act (750 ILCS 5/503 (West 2006)). See *Lundahl*, 396 Ill. App. 3d at 498-99. The trial court classified the retained earnings in this manner because the husband "was the sole shareholder, officer, and director of AIS, and because he had sole discretion over how much of the retained earnings should be distributed to him, the retained earnings were marital property." *Id*. at 498. The husband argued on appeal that because AIS was acquired before his marriage, despite its increase in value due to his personal efforts, the retained earnings of the corporation remained nonmarital as part of AIS's property. The reviewing court disagreed, finding that the retained earnings of AIS were not held by the corporation to pay expenses. *Id*. at 504. The *Lundahl* court also noted that the retained earnings were not used to pay dividends, nor were they used in connection with the corporation. *Id*. The reviewing court agreed with the trial court's determination that the retained earnings were properly classified as marital property because the husband "was the sole owner and shareholder of AIS, and thus the income of AIS during the marriage was attributable to [the husband], making such income marital property." *Id*.

¶ 61 Similarly, in *Dann*, the respondent wife challenged the trial court's summary judgment ruling that certain assets were part of her husband's nonmarital estate. *Dann*, 2012 IL App (1st) 100343, ¶ 1. The parties contested the classification of stock purchased by a trust that benefitted the husband. The reviewing court, whose decision was guided by section 503 of the Act, considered two factors in determining whether retained earnings constituted marital property: " '(1) the nature and extent of the stock holdings, *i.e.*, is a majority of the stock held

by a single shareholder spouse with the power to distribute the retained earnings; and (2) to what extent are retained earnings considered in the value of the corporation.' " *Id.* ¶ 79 (quoting *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819 (2007)). The *Dann* court held that the record contained no evidence to rebut the presumption that the payments from the husband's company, DBI, for the purchase of 550 shares of stock were attributable to the husband's personal effort. *Id.* ¶ 86. The only evidence before the trial court was testimony from the husband and an accountant that DBI made payments so that the trust could purchase 550 additional shares of DBI, and the husband's testimony that the payments were "distributions" from DBI. *Id.* Citing *Lundahl*, the reviewing court noted that distributions "disbursed during the marriage may be considered nonmarital property if proven not to be compensation to the spouse, that is, if proven not to be due to 'the personal effort of a spouse.' " *Id.* The *Dann* court found that the record at the summary judgment stage was silent on whether DBI even deemed the transfers to be distributions or dividends rather than salary, which is typically compensation for personal effort. *Id.* Because material fact questions remained on these issues, the reviewing court found summary judgment in favor of the husband was improper. *Id.*

¶ 62 We find that *Lundahl* and *Dann* are inapplicable to this case, as neither involved the interpretation of an MSA. The parties in those cases did not enter into MSAs. Deborah argued in her opening brief that "[t]he Circuit Court found that the funds for the September Distribution were a Mudd Lyman asset, meaning that they were a component of the company's overall value." This is not what the trial court found. According to the December 19, 2011 written order, the entire sentence that Deborah alludes to states as follows: "The Court finds that the value of the Mudd Lyman entity included all components of its assets, its income or other holdings *was fully litigated between the parties and valued in 2008*." (Emphasis added.) In other words, the trial court's conclusion related to the fact the parties conducted their own discovery to find out the value of each other's assets. The trial court did not specifically hold that the September 30, 2009 final distribution was a Mudd-Lyman asset, in detriment to Deborah. The trial court found the record demonstrated "that Robert was aware and disclosed to [Deborah] that he would receive a final payment for the 2009 calendar year." The trial court never characterized this payment as accounts receivable, retained earnings, or any asset that would raise a genuine issue of material fact as to whether the final payment was marital property. This is because the parties negotiated, bargained for, and entered into an MSA wherein Robert agreed to pay Deborah $475,000 by January 15, 2010 and in return, Robert would receive 100% of his interest in the Mudd-Lyman entities. As the trial court noted, the $475,000 amount was agreed to by the parties because at the time they entered into the MSA, respondent "did not know the exact amount or the exact date those sums would be distributed by Home Depot to Mudd Lyman."

¶ 63 Robert relies on *Goldsmith*, a case that does actually deal with extrication from an MSA. In that case, the wife contested the MSA, alleging the husband concealed assets. The parties "agreed to the entry of a judgment of dissolution of marriage that incorporated a settlement agreement in which the parties acknowledged they engaged in limited discovery." *Goldsmith*, 2011 IL App (1st) 093448, ¶ 1. In lieu of formal discovery, each party represented and warranted that a full and complete disclosure of his or her property had been made to the other. *Id.* During a prove-up hearing, the petitioner wife agreed that she entered into the MSA with full satisfaction that the respondent husband disclosed all of his assets and that she relied on this disclosure. She acknowledged and understood that she could have taken further discovery,

but chose not to do so. About a year and a half after judgment was entered, the wife filed a section 2-1401 petition seeking to vacate the judgment of dissolution, alleging she discovered that the husband concealed three assets worth nearly $2 million. The trial court entered summary judgment in favor of the husband.

¶ 64     On appeal, the wife argued that had the trial court known of the three assets, it would not have entered the dissolution judgment in the same manner and she would have received a share of the three assets. The husband countered that a showing of diligence by the wife was foreclosed because she either knew of the assets or they were discoverable in the course of formal discovery, which she failed to pursue. The reviewing court noted that "[w]hen a divorce party elects to forego formal discovery in favor of accepting a representation and warranty of full and complete disclosure, the party does so at his or her own peril." *Id*. ¶ 47. The reviewing court affirmed the trial court, finding that the wife did not act with due diligence regarding her claims of the purportedly undisclosed assets. *Id*. ¶ 50. The *Goldsmith* court held that "to allow the petitioner to proceed with her section 2-1401 petition would give her a second opportunity to do that which should have been done in the initial proceedings." *Id*. "A representation and warranty of full disclosure in a marital settlement agreement, even when the full disclosure is confirmed by affidavit *** cannot be used as an escape hatch to avoid the consequences of failing to act diligently in the first instance by engaging in sufficient discovery, a proposition that has been long established in Illinois law." *Id*. ¶ 51.

¶ 65     We follow the holding in *Goldsmith*, as it is quite similar to this case. None of Deborah's postjudgment pleadings pled that the September 30, 2009 distribution should be considered as retained earnings which were marital assets under section 503 of the Act. Article VIII, section 8.1, of the MSA clearly states that Robert was not required to disclose the value of his interest in the Mudd-Lyman entities. Significantly, Deborah has not explained in her briefs, nor can we find in the record, what else the segregated $475,000 payment could possibly be for, other than what Robert has repeatedly represented was payment for the anticipated final distribution, which is supported article VII of the MSA. This portion of the MSA shows that Deborah agreed to receive $475,000 on or before January 15, 2010 in exchange for Robert retaining as his property 100% of his interest in the Mudd-Lyman entities. We reject Deborah's argument on this issue, as the trial court did not make the factual finding that she asserts and the case law she cites in support of her argument does not apply here.

¶ 66                    The Trial Court's Alleged Consideration of Facts Pled Beyond the Petition

¶ 67     Deborah contends that the trial court considered allegations pled by Robert in his section 2-619 motion that led to the court finding either *res judicata* under section 2-619(a)(4) applied or that "other affirmative matter" barred her claim under section 2-619(a)(9). Deborah argues the court improperly considered Robert's arguments, including that the parties extensively considered and negotiated the September 30, 2009 distribution and that Deborah waived her right to learn its precise amount in return for the $475,000 payment. Deborah asserts she never alleged such facts in her section 2-1401 petition, nor were they apparent on the face of the MSA. She points out that the MSA did not contain any provision describing from where the funds to pay the $475,000 originated or state that the $475,000 represented her share of the September 30, 2009 distribution. Deborah argues that her pleading alleged she did not know about the September distribution and, yet, the court improperly based its ruling on Robert's

contradictory allegations instead of taking her pleadings as true. Deborah asserts the court did not apply the proper standard under section 2-619.

¶ 68    We find that the MSA forecloses Deborah's argument regarding the trial court's findings as a matter of law under both sections 2-619(a)(4) and 2-619(a)(9). Section 2-619(a)(4) allows for the dismissal of an action if it "is barred by a prior judgment." 735 ILCS 5/2-619(a)(4) (West 2010). "Under the doctrine of *res judicata*, a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). There are three requirements before r*es judicata* applies to bar a claim: (1) "a final judgment on the merits rendered by a court of competent jurisdiction"; (2) "an identity of [the] cause[s] of action"; and (3) "an identity of parties or their privies." *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 335 (1996). In determining whether there is an identity between the causes of action, it is well established that " 'separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief.' " *Doe v. Gleicher*, 393 Ill. App. 3d 31, 37 (2009) (quoting *River Park*, 184 Ill. 2d at 311). Moreover, *res judicata* applies "not only to what was actually decided in the original action, but also to matters which could have been decided in that suit." *Rein*, 172 Ill. 2d at 334-35.

¶ 69    Deborah argues that the trial court's *res judicata* decision was in error because it barred her section 2-1401 claim based on the same judgment that she alleged was fraudulently induced. In her amended section 2-1401 petition, she alleges that pursuant to Article VIII, section 8.1, Robert "was not obligated 'to disclose the value of his interests in the Mudd Lyman entities.' " The next sentence of the pleading states "this provision did not mean that Robert was not required to disclose the rights he had to income and distribution from Mudd Lyman in 2009." Alleging fraud, Deborah asserted that "[b]y submitting the Asset Affidavit and certifying that it was a complete and accurate representation of his assets without including the September 2009 distribution or the money on hand in the Mudd Lyman Bank of America account, Robert made false statements of material fact under oath."

¶ 70    Deborah's argument fails here because article VIII, section 8.1, of the MSA specifically stated that Robert "need not disclose the value of his interests in the Mudd Lyman Entities." Article VII, section 7.1, of the MSA states that, '[a]s a further division of marital and/or property rights, the Husband shall retain as his sole and separate property *free and clear of any and all rights, claims or interest of the Wife *** $475,000 to be paid on or before January 15, 2010*" in exchange for 100% interest in the Mudd-Lyman entities. (Emphasis added.) While we sympathize with Deborah's dogged determination to show Robert concealed his assets, the record simply does not support such a conclusion. The record shows Robert's attorney notified Deborah that Robert would no longer be receiving a paycheck as of July 17, 2009 due to the termination of the Home Depot contract. Deborah complained that she did not receive a temporary support payment during this period. These facts support the conclusion that Robert did not receive any income between July 17, 2009 and September 2, 2009. Deborah also conducted extensive discovery of the Mudd-Lyman entities' operations and retained an expert to value the companies. Unfettered access to the Mudd-Lyman records meant access to information regarding the amount and frequency of the distributions company officers received under the Home Depot contract and any accounts receivable owed to the company, including retained earnings and unpaid Home Depot invoices.

¶ 71    Marital settlement agreements are contracts and, therefore, the rules governing the interpretation of contracts apply. See *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300 (2005). "The primary goal of contract interpretation is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms." *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636-37 (2008). "As a general rule, the parties' intentions are determined from their final agreement." *Kehoe v. Commonwealth Edison Co.*, 296 Ill. App. 3d 584, 590 (1998). Illinois follows the "four corners rule for contract interpretation in that, " '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc.*, 185 Ill. 2d at 462.

¶ 72    In this case, we find that the language of article VII, section 7.1, and article VIII, section 8.1, unambiguously speaks for itself. Further, we conclude that the trial court properly applied the doctrine of *res judicata* to this case. The court rendered a final judgment of dissolution which incorporated the MSA. An identity between the causes of action exists because they arise from a single group of operative facts stemming from the MSA. Finally, Deborah and Robert are the same parties involved in the judgment of dissolution and the postjudgment litigation. The parties negotiated and bargained for the amount Deborah would receive in exchange for Robert receiving 100% of his interest in the Mudd-Lyman entities. As such, *res judicata* applies not only to the judgment of dissolution, but also to matters which could have been decided, such as what Deborah claims here, *i.e.*, not receiving her fair share of the September 30, 2009 final distribution. *Rein*, 172 Ill. 2d at 334-36.

¶ 73    Section 2-619(a)(9) also requires dismissal of the section 2-1401 petition. Under section 2-619, we consider Robert to have admitted the well-pleaded facts of Deborah's amended section 2-1401 petition, and we interpret not only the pleadings but also all supporting documents in a light most favorable to Deborah. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 141 (2006). We also deem Robert as the movant to have admitted the legal sufficiency of the complaint. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). Given those admissions and resolving all reasonable inferences in Deborah's favor, we " 'must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008) (quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993)). " 'Affirmative Matter,' within the meaning of section 2-619(a)(9) must be something more than the assertion that the complaint fails to state a cause of action, since the well-pleaded facts must be taken as true for purposes of a section 2-619 dismissal." *Bank of Northern Illinois v. Nugent*, 223 Ill. App. 3d 1, 16 (1991). The "affirmative matter" that allows for dismissal of this case is the clear and unambiguous language of the MSA, which both parties drafted together, negotiated, bargained for, and agreed to all the terms upon execution. See *Howard v. Chicago Transit Authority*, 402 Ill. App. 3d 455, 458-59 (2010) (holding the trial court properly dismissed the plaintiff's complaint under section 2-619(a)(9) based on acceptance of terms in a contract). We find that either under section 2-619(a)(4) or section 2-619(a)(9), the trial court properly dismissed Deborah's amended and

second amended section 2-1401 petitions.

¶ 74                    The Trial Court's Dismissal of the Fraud Claim
                            Based on the Terms of the MSA

¶ 75    Deborah argues that the trial court erred by dismissing her fraud claim as a matter of law based solely on the terms of the MSA. We discussed this in detail above, but briefly review to specifically address this contention.

¶ 76    When interpreting a marital settlement agreement, a court seeks to give effect to the parties' intent. *Allton v. Hintzsche*, 373 Ill. App. 3d 708, 711 (2007). The language used in the agreement is usually the best indication of the parties' intent. *Id.* When the terms of the agreement are unambiguous, we determine the parties' intent solely from the language of the agreement. *Id.* An ambiguity is not created simply because the parties disagree on the meaning of any provision. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 372 (2007). Deborah does not claim an ambiguity; rather, she argues that her fraud claim cannot be determined by looking at a settlement agreement alone, citing *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 760-61 (2004).

¶ 77    Deborah's reliance on *W.W. Vincent* is misplaced. *W.W. Vincent* involved a stock purchase agreement that contained an integration clause. *W.W. Vincent*, 351 Ill. App. 3d at 758. The defendant claimed that the parol evidence rule and the integration clause precluded the plaintiffs from asserting a cause of action for fraud. *Id.* at 760. The court in *W.W. Vincent* held that the presence of an integration clause did not bar the plaintiffs' actions for fraud. *Id.* at 761. *W.W. Vincent*, which did not involve a marital settlement agreement, did not hold, as Deborah claims, that a trial court cannot determine a fraud claim by looking to the marriage settlement agreement alone.

¶ 78    "A settlement agreement will only be set aside if the misrepresented assets 'could not reasonably have been discovered at the time of or prior to the entry of the judgment.' " *Broday*, 256 Ill. App. 3d at 703 (quoting *Travlos*, 218 Ill. App. 3d at 1035). "A divorcing party will not be relieved of the consequences of her own lack of diligence in failing to discover such information relevant to the divorce proceeding." *Id.* (citing *Travlos*, 218 Ill. App. 3d at 1035). In this case, the fact that Deborah could have discovered information about Robert's alleged misrepresentation of his assets through her own investigation diminishes her claim of detrimental reliance. *Broday*, 256 Ill. App. 3d at 704; see also *Travlos*, 218 Ill. App. 3d at 1038-39 (ex-husband's allegations of fraudulent concealment did not excuse his lack of due diligence in discovering evidence of ex-wife's property ownership); *Lagen v. Lagen*, 14 Ill. App. 3d 74, 81 (1973) (wife sought to vacate divorce judgment and oral property settlement alleging her husband fraudulently concealed his assets, but reviewing court found she had ample opportunities to examine facts of husband's financial worth).

¶ 79    It is clear that Deborah had access to Robert's business records. At the prove-up hearing, Deborah had the opportunity to request additional discovery if she was dissatisfied with the financial information provided by her expert. She chose not to do so and testified that she was satisfied with Robert's financial disclosures. Deborah elected to forego further discovery in favor of accepting a representation and warranty of full and complete disclosure at her own peril. *Goldsmith*, 2011 IL App (1st) 093448, ¶ 47. We find the trial court committed no error by relying on the clear and unambiguous language of the MSA in its decision to dismiss Deborah's amended and second amended section 2-1401 petitions under section 2-619.

¶ 80                                                    Due Diligence

¶ 81        Deborah argues that she exercised due diligence under the circumstances of this case. She alleged in her section 2-1401 petitions that Robert lied about the existence and value of his assets. Those misrepresentations led her to believe that there was little value to be derived from the Mudd-Lyman entities, which induced her to end the costly discovery process and enter into the MSA. The terms of the MSA did not consider the "substantial September Distribution." Deborah contends she relied on the representations Robert made in his asset affidavit, which was incorporated into the judgment. She cites *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, in support of her argument that the due diligence requirement of section 2-1401 is not strictly enforced when there is fraud or unfair conduct. Deborah notes in her opening brief that the *Roepenack* court "affirmed judgment for a wife on a Section 2-1401 petition by giving her an incorrect calculation of his income during settlement negotiations, leading her to believe that the value of a marital business was very small, and testifying to an inaccurate statement of income before the trial court."

¶ 82        In *Roepenack*, the husband was represented by counsel and the wife was unrepresented. *Roepenack*, 2012 IL App (3d) 110198, ¶ 36. She could not afford an attorney as she earned $3,000 per year. During settlement negotiations, the husband misstated his actual income. He conceded that his earnings disclosure was not accurate. The inaccuracy of the husband not only affected the child support calculation but the wife's perceived value of the business. The husband did not disclose the existence of the appraisal of his businesses and led her to believe that the value of those businesses were worth little to nothing. In addition, the wife was unaware of the existence of a retirement account or $30,000 that the husband held in a savings account. The trial court found that the marital settlement agreement executed by the parties was unconscionable and procured by fraud, which was supported by the fact that the husband: (1) received the majority of the marital assets; (2) submitted an unauthorized deviation of child support; and (3) failed to disclose marital and personal assets. *Id.* ¶ 39. The reviewing court noted the marriage settlement agreement likely would not have been approved by the trial court had it been furnished with complete information. *Id.* It found that the wife presented a meritorious claim under section 2-1401. The husband argued on appeal that the wife failed to use sufficient diligence in discovering the value of the businesses and other assets in presenting her claim. Rejecting this argument, the reviewing court noted that the wife had little money to hire an attorney and that she may have sought out the value of the businesses if he had not misled her into believing there was little to no value in the businesses. *Id.* ¶ 40. The *Roepenack* court found it was appropriate under the circumstances of the case to "lower the *** bar" on the due diligence requirement because of the wife's financial situation and the husband's fraud on both his wife and the trial court. *Id.*

¶ 83        In contrast to *Roepenack*, the circumstances of this case are distinguishable as Deborah was represented by counsel and hired an expert to value the Mudd-Lyman entities. On May 15, 2009, the expert valued the Mudd-Lyman entities at $38 million. Robert disclosed to Deborah in January 2009 that the Home Depot contract would terminate on July 10, 2009. Deborah had the finances and resources to continue her investigation in order to determine the value of the Mudd-Lyman entities for the remainder of 2009, but she chose not to do so. Other than claiming Robert lied about the September 30, 2009 distribution, there is no record evidence supporting her fraud claim that would allow this court to find she exercised due diligence in her investigation of his financial status. Deborah had every opportunity to negotiate into the MSA a clause requiring Robert to disclose the value of his interests in the Mudd-Lyman entities and

did not do so. At the prove-up hearing, she had the opportunity to challenge whether Robert fairly valued his assets, but did not do so. Robert received a postjudgment distribution check in the amount of $1,734,475.21, which totaled $1,084,914.24 after taxes. The MSA provided that Deborah would receive $475,000 by January 15, 2010, which is approximately 44% of the "surprise" distribution. Although Deborah argues to the contrary and her counsel denied during oral argument that the $475,000 payment to her was made in anticipation of Robert receiving an unknown final sum from Home Depot, Robert's argument in opposition is more plausible. Deborah has not shown that the $475,000 she received postjudgment was anything other than what she bargained for in the MSA in exchange for Robert receiving 100% of his interest in the Mudd-Lyman entities. As in *Goldsmith*, we find Deborah failed to exercise due diligence when she elected to accept Robert's representation of financial disclosure over the opportunity to engage in formal discovery. *Goldsmith*, 2011 IL App (1st) 093448, ¶ 49. Given the record before us, we conclude that Deborah did not act with due diligence regarding her claims of allegedly undisclosed assets. *Id*. ¶ 50. While we empathize with Deborah's argument that Robert lulled her into foregoing further discovery, we cannot overlook the obvious. Specifically, Deborah may have made a bad decision, but we cannot extricate her from the natural consequences of her own decision making. To allow Deborah to proceed with her section 2-1401 petition would give her a second opportunity to do that which should have been done before executing the MSA. *Id.*

¶ 84                     Dismissal of Deborah's Breach of MSA Claim Under Section 2-615

¶ 85       Deborah asserts the trial court erred in dismissing her petition for breach of the MSA. She contends that she properly stated a claim for breach of contract sufficient to survive a section 2-615 motion to dismiss.

¶ 86       As we previously noted, the trial court dismissed the verified petition for breach of the marital settlement agreement with prejudice based on section 2-615. We earlier held that the trial court committed error by granting Deborah leave to replead the exact same breach of the MSA claim in her second amended section 2-1401 petition without any amendment to cure the defective pleading. 735 ILCS 5/2-616(a) (West 2010). As such, the issue is forfeited and we need not reach the merits of her argument on this issue.

¶ 87                     The Imposition of Sanctions Under Rule 137

¶ 88       Deborah's final argument concerns the imposition of sanctions under Rule 137 for filing redacted versions of documents for the trial court's consideration. She asserts that the court abused its discretion considering that the complete versions of those documents were authored by and were in possession of Robert's counsel. Deborah also contends that the court held no evidentiary hearing prior to imposing sanctions and made no reference to any evidence in making its findings.

¶ 89       Rule 137 requires that either an attorney for a party or a party sign every "pleading, motion or other paper" to certify that "it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 137 (eff. Feb. 1, 1994). The purpose of the rule is to prevent abuse of the judicial process by penalizing claimants who bring vexatious and harassing actions based upon unsupported allegations of fact or law. *Fremarek v. John*

*Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074 (1995). A trial court's decision to impose sanctions is entitled to significant deference, and we will not disturb its decision absent an abuse of discretion. *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 33; *North Shore Sign Co. v. Signature Design Group, Inc.*, 237 Ill. App. 3d 782, 790 (1992). A trial court abuses its discretion "only where no reasonable person would take the view adopted by it." *Fremarek*, 272 Ill. App. 3d at 1074.

¶ 90 "Generally, a hearing on both the merits and the amount of fees is required before an award can be made." *North Shore Sign*, 237 Ill. App. 3d at 790; see also *Century Road Builders, Inc. v. City of Palos Heights*, 283 Ill. App. 3d 527, 531 (1996) ("An evidentiary hearing should always be held when a sanction award is based upon a pleading filed for an improper purpose, rather than one that is merely unreasonable based on an objective standard."). The trial court did not conduct a hearing on the merits of Robert's motion for sanctions, although the parties briefed the issue. The court found that Deborah's submission of redacted documentation for the court's consideration, which was attached to her pleading, was done for an improper purpose to "direct and sway the Court's attention to those passages which would support her argument" that respondent defrauded her.

¶ 91 Section 508 of the Act provides the trial court with statutory authority to award attorney fees. 750 ILCS 5/508 (West 2010). Section 508(a)(2) of the Act allows the court to award attorney fees in connection with "[t]he enforcement or modification of any order or judgment under this Act." 750 ILCS 5/508(a)(2) (West 2010). Section 508(a)(3) states that the court "may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees," including "[t]he defense of an appeal of any order or judgment under this Act, including the defense of appeals of post-judgment orders." 750 ILCS 5/508(a)(3) (West 2010).

¶ 92 Counsel for Deborah gave an explanation for the redaction which can be interpreted as reasonable. The imposition of Rule 137 sanctions is a serious matter. A trial court may not impose such sanctions on the basis of a suspicion, a feeling, or a belief. More is required.

¶ 93 In this case, the order entered by the trial court suggests that no evidence was taken on the issue of whether the redacted letters at issue were filed for any improper purpose. Accordingly, we cannot give deference to the trial court's ruling on sanctions, as the court did not base its determination upon evidence taken at a hearing or matters of record which justify foregoing an evidentiary hearing. *Century Road Builders*, 283 Ill. App. 3d at 531. Therefore, we conclude that the trial court must vacate its March 21, 2013 order granting respondent's motion for sanctions. In so doing, we note that awarding sanctions on this novel issue is probably unwarranted, and accordingly we remand this matter for a hearing to determine the propriety of awarding attorney fees to Robert under section 508(a) of the Act. 750 ILCS 5/508(a) (West 2010).

¶ 94                                    CONCLUSION

¶ 95 We affirm the decision of the trial court to dismiss Deborah's amended and second amended section 2-1401 petitions. We find as a matter of law that the trial court properly dismissed Deborah's amended and second amended section 2-1401 petitions pursuant to Code sections 2-619(a)(4) and 2-619(a)(9). We reverse the trial court's decision to grant leave to Deborah to file her second amended section 2-1401 petition. We vacate the trial court's March 21, 2013 order granting sanctions to Robert and remand this matter for a hearing to determine

the propriety of awarding attorney fees to Robert under section 508(a) of the Act.

¶ 96        Affirmed in part, reversed in part, vacated in part, and remanded with directions.