2023 IL App (2d) 220041
No. 2-22-0041
Opinion filed February 24, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| JEFFREY R. HYMAN, | ) | of Lake County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 14-D-2299 |
| | ) | |
| RACHEL D. HYMAN, | ) | Honorable |
| | ) | Christopher Lombardo, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Schostok and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, Jeffrey R. Hyman, appeals from the trial court's order granting the postdecree petition of respondent, Rachel D. Hyman, seeking the allocation of an undisclosed marital asset pursuant to the  marital settlement agreement (MSA) incorporated within the judgment for dissolution of the parties' marriage. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    The 13-year marriage of Jeffrey and Rachel was dissolved on December 31, 2015. For a period during the marriage, Jeffrey had been self-employed, running Strong Suit LLC (Strong Suit), a consulting company that he owned. In his answers to interrogatories, Jeffrey described

Strong Suit as having ceased operations in 2010, although it remained a legal entity in Delaware. He also disclosed that Strong Suit's business checking account had been closed in September 2014.

¶ 4       In May 2015, during the dissolution proceedings, Jeffrey stated in a response to a document request that, as of May 5, he had not established any new entities or businesses beyond those already disclosed, which included Strong Suit. However, in the spring of 2015, Jeffrey had reactivated Strong Suit. In June 2015, he entered into an agreement with Fitness, Cubed, Inc. (Cubed), to provide consulting services "for no more than an average of two hours per week." The sole consideration for these services was stock options issued by Cubed. Pursuant to the stock option agreement, Jeffrey was awarded nonqualified options to purchase 500 shares of Cubed stock at an exercise price of $7.30 per share for a nominal value of $3650. Forty of the options vested immediately, in June 2015; 20 shares vested on the first day of each month until May 2017. The vesting of options would occur only if Jeffrey continued to be a consultant on the vesting date. The stock option agreement was executed in Jeffrey's name individually, rather than that of Strong Suit, to avoid disclosure and tax issues. By the time the judgment of dissolution was entered in December 2015, 160 of the options had vested.

¶ 5       On June 24, 2015, Jeffrey and Rachel entered an agreed order under which Jeffrey was to provide Rachel's counsel a monthly summary of "work performed by Jeffrey relative to any new business venture and a job log, if any, of employment positions pursued by Jeffrey." Jeffrey provided information on a new business called Startup Therapist; Strong Suit was doing business as (d/b/a) Startup Therapist. However, he never provided any information regarding the consulting work performed for Cubed.

¶ 6       Jeffrey and Rachel engaged in settlement discussions. In October 2015, Rachel filed a second supplemental document request, seeking, *inter alia*, a listing of all sources of compensation

earned by Jeffrey through his "employment with Startup Therapist *or any other entity*, including but not limited to salaries, director's fees, bonuses, and fringe benefits" (emphasis added), all documents reflecting all amounts paid to Jeffrey for his benefit, and "[a]ll employment, management, contracts for services or consulting agreements in effect." Jeffrey responded that he did not need to comply with the request, because they were discussing settlement. Further, if compliance was required, he would need additional time to respond. Settlement discussions continued; Rachel did not follow up on her request, and Jeffrey did not produce any more documents.

¶ 7    Jeffrey and Rachel executed their MSA on December 31, 2015. In the MSA, they both acknowledged that they

> "have both fully disclosed all of their assets (which are set forth in Exhibit 'A' attached hereto and made a part hereof and which assets are being equally divided pursuant to the balance sheet and the terms of this Agreement), liabilities, and income, and that each is fully conversant with the assets, liabilities and income of the other party."

Amongst other business interests, Jeffrey was awarded "as his sole and separate property his interest in the business entity known Strong Suit LLC d/b/a Startup Therapist." The attached balance sheet showed the value of Strong Suit LLC d/b/a Startup Therapist as "TBD." The MSA also provided:

> "In the event there are additional marital assets discovered not otherwise set forth in this agreement, upon disclosure/discovery of an additional marital asset, said marital asset shall be divided between the parties as follows: fifty percent (50%) to Rachel and fifty percent (50%) to Jeffrey using the greater of (a) the value of the asset at the time the property is

discovered or (b) value of the asset on the date of entry of a Judgment for Dissolution of

Marriage."

The trial court entered the judgment of dissolution, incorporating the MSA.

¶ 8      After the dissolution, Strong Suit continued its monthly consulting work for Cubed. The

stock options continued to vest on a monthly basis, and Jeffrey acquired additional options to

purchase Cubed stock in an agreement entered into in February 2016. In May 2021, Jeffrey

executed a termination and settlement agreement with Cubed, pursuant to which he received

$739,865 in exchange for his options. This included the 500 stock options awarded pursuant to the

original stock option agreement (160 of which had vested during the marriage), as well as the

options that were awarded pursuant to the February 2016 agreement.

¶ 9      In February 2021, Rachel filed a petition for allocation of undisclosed marital asset,

alleging that Jeffrey had failed to disclose as a marital asset his interest in Cubed and seeking the

equal division of that interest. After a hearing, the trial court found in favor of Rachel on January

27, 2022. In its oral ruling, the court found that the options were not contemplated in the drafting

of the MSA because no one other than Jeffrey knew of their existence. The court had no problem

with Jeffrey holding the options in his own name for tax purposes and stated, "I don't think

necessarily Mr. Hyman was trying to conceal anything." At the time that the options were initially

awarded, "they held very little value." However, the court noted that Jeffrey was "directly asked

the question is there anything that you are aware of that you have not disclosed." The court

concluded that all 500 of the stock options awarded during the marriage were marital property and

subject to equal division; no distinction was made between options that had vested during the

marriage and those that had not. Ultimately, Rachel's 50% share was calculated to be $246,597

and, after taxes and expenses, Jeffrey was required to pay Rachel $130,196. A written order to that

effect was entered on February 2, 2022. The next day, the court entered a further order continuing all other pending matters and finding no just reason to delay enforcement or appeal of the order regarding the allocation petition.[1] This appeal followed.

¶ 10                                          II. ANALYSIS

¶ 11    Jeffrey first contends that the trial court erred in concluding that the Cubed stock options were not disclosed within the meaning of the MSA. An MSA is construed in the manner of any other contract, and a court must ascertain the parties' intent from the language of the agreement. *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009). A trial court's factual findings are reviewed deferentially; its findings of fact will not be disturbed on review unless those findings are against the manifest weight of the evidence. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 154 (2005). A trial court's judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70. A trial court's conclusions of law are reviewed *de novo*. *Id.* ¶ 37. A court's interpretation of a marital settlement agreement is reviewed *de novo* as a question of law. *Blum*, 235 Ill. 2d at 33.

¶ 12    Jeffrey first argues that the Cubed stock options were nominal assets of Strong Suit that did not warrant separate disclosure. We first note that the options were held by Jeffrey, not Strong Suit. While the agreement for consulting services was between Cubed and Strong Suit, the notice of stock option grant and stock option agreement from Cubed clearly show that the grant was to Jeffrey; Strong Suit is never mentioned in the grant. In its oral ruling, the trial court referred to the

---

[1]Petitions and motions regarding modification of maintenance and child support, attorney fees, and a rule to show cause remained pending.

options as "shares awarded directly to Jeff Hyman withheld [*sic*] in this company that he was awarded." Jeffrey testified that the options were put under his name to avoid disclosure and tax issues, and the trial court had "no problem with him doing so," even stating that it did not believe that Jeffrey "was trying to conceal anything." However, the fact remains that the options were issued and held in Jeffrey's name. They were, therefore, *his* assets, not Strong Suit's. Thus, the remainder of this argument (that the options were disclosed as part of Jeffrey's interest in Strong Suit, an asset of "Unknown" value) is counterfactual and an immaterial conflation.

¶ 13    Jeffrey next argues that the MSA's undisclosed-asset provision cannot be used to penalize him and reward Rachel for her decision not to pursue further discovery. In October 2015, two months before the dissolution judgment, Rachel had filed a second supplemental document request regarding Jeffrey's finances, but she never followed up after Jeffrey responded that he did not need to comply with the request because they were discussing settlement or, alternatively, that he would need additional time to respond if compliance was required. According to Jeffrey, case law stands for the principle that each party will be held responsible for their own decisions to discontinue discovery and settle a case. See, *e.g.*, *In re Marriage of Lyman*, 2015 IL App (1st) 132832, ¶ 78 ("A divorcing party will not be relieved of the consequences of her own lack of diligence in failing to discover such information relevant to the divorce proceeding." (Internal quotation marks omitted.)). Jeffrey argues:

> "[T]here is no question that Rachel *could have* learned about the stock options of nominal value that Strong Suit was earning for its two-hours per week of consulting for Cubed, had she decided to pursue further discovery and litigation instead of settling the case." (Emphasis in original.)

Accordingly, Rachel "must be held responsible for her choice to end discovery and settle the case knowingly and self-interestedly to secure her benefit of the bargain."

¶ 14    We disagree. First, again, this argument assumes that the options were an asset of Strong Suit. They were not; they were held by Jeffrey. In any event, it is clear that Jeffrey took every opportunity to fail to provide Rachel with this information. In his January 2015 answers to interrogatories, Jeffrey listed his interest in Strong Suit, noting that its operations had ceased in 2010 and that its bank account was closed in 2014. After he was ordered to submit a monthly summary of work performed and a job log, Jeffrey never mentioned the work done for Cubed or even his resurrection of Strong Suit as its own entity. He never responded to Rachel's supplemental document request.

¶ 15    In the MSA, Jeffrey acknowledged that he had "fully disclosed" all his assets, which were set forth in the attached exhibit A. No mention of the options was made. At the prove-up, Jeffrey was asked:

> "You have disclosed all of your assets and debts and they're all reflected in the document and on the spreadsheet that's attached to the Marital Settlement Agreement; is that correct?"

Jeffrey responded, "Yes." When asked if there were any other assets or debts that he had not disclosed, he responded, "No."

¶ 16    During the hearing on Rachel's petition, Jeffrey admitted that he did not provide evidence reflecting the receipt of the grant of stock options in response to Rachel's second supplemental document request, nor had he ever provided any documentation regarding the work he was doing through Strong Suit, which he had previously described as having ceased operations. He "didn't know" that he had to inform Rachel that he had received compensation in the form of the stock

options. Jeffrey's counsel even informed the court that he had no evidence that Rachel or her attorneys were aware of the shares or waived inquiry into them.

¶ 17     Jeffrey had multiple opportunities and fora in which to fulfill his obligation to notify Rachel of the receipt of the stock options as compensation for his work for Cubed, but he failed in all instances. He cannot now complain that Rachel did not dig deeply enough after he failed to disclose the options when he should have.

¶ 18     Jeffrey places great reliance here on *In re Marriage of Goldsmith*, 2011 IL App (1st) 093448, ¶ 51. In *Goldsmith*, the parties agreed to the entry of a judgment for dissolution of marriage that incorporated an MSA that acknowledged that, in lieu of formal discovery, the parties represented and warranted that they had fully and completely disclosed their property to each other. About 18 months after the judgment was entered, the wife filed a postjudgment petition brought, in part, pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2008)), alleging that the husband concealed almost $2 million in assets and seeking to vacate the judgment. *Goldsmith*, 2011 IL App (1st) 093448, ¶ 7. The trial court granted summary judgment in favor of the husband.

¶ 19     The appellate court affirmed. The court's rejection of the wife's contention that she had a meritorious claim to the assets was fatal to her petition; however the court elected to address the wife's claim that "she acted with legal due diligence based on her reliance on the representation and warranty in the MSA and the [husband's] unsigned affidavit." *Id.* ¶ 47. It did so "to make clear that the [wife's] contention of legal diligence based on reliance, in lieu of formal discovery, is without support in Illinois law." *Id.* The court concluded:

> "A representation and warranty of full disclosure in a marital settlement agreement, even when the full disclosure is confirmed by affidavit (albeit unsigned here) cannot be

used as an escape hatch to avoid the consequences of failing to act diligently in the first instance by engaging in sufficient discovery, a proposition that has been long established in Illinois law." *Id.* ¶ 51.

Given the record in the case, the court agreed with the trial court's finding that the wife did not act with due diligence regarding her claims of the purportedly undisclosed assets. Without such a showing, she failed to establish a necessary element to reopen the judgment. "We find no error in the trial court's conclusion that to allow the [wife] to proceed with her section 2-1401 petition would give her a second opportunity to do that which should have been done in the initial proceedings." *Id.* ¶ 50.

¶ 20    *Goldsmith* is clearly distinguishable from the case before us. When a section 2-1401 petition is based on newly discovered evidence, the petitioner must show that the new evidence was not known to her at the time of the proceeding and could not have been discovered with the exercise of reasonable diligence. *In re Marriage of Brubaker*, 2022 IL App (2d) 200160, ¶ 20. Due diligence on Rachel's part was not required here, as her petition was not brought pursuant to section 2-1401 and did not seek to reopen the judgment. Rachel merely petitioned the court to enforce the MSA as it was entered into by the parties and incorporated by the trial court in the judgment of dissolution.

¶ 21    We further note that the MSA provided for the 50-50 split "[i]n the event there are additional marital assets discovered not otherwise set forth in this agreement." This clause did not place any restrictions on how, when, or why the assets were discovered or why they were not discovered or disclosed previously. Thus, even if Rachel was found to have been less than zealous in her inquiries leading up to settlement, the plain language of the MSA would require that Rachel receive 50% of the asset. We find no error here.

¶ 22    Jeffrey finally argues that the trial court erred in barring him from introducing at the hearing letters from Rachel's counsel generated during settlement negotiations. According to Jeffrey, these letters were relevant because they were evidence that both parties understood that the award of Strong Suit to Jeffrey included "*everything* pertaining to the business—accounts, receivables, assets, etc.—without need for further specification." (Emphasis in original.) Thus, the parties agreed that Jeffrey would be allowed to earn "unlimited income in the future" from his business interests "without having ever to share it with Rachel." This would include the $739,865 generated in the exchange and settlement with Cubed for the stock options. The trial court refused to admit the evidence, finding that it had "no absolutely relevance [*sic*]. The ultimate agreement is already in evidence." The court further stated that the issue "is not about whether he should share the business. It's whether he should share an asset that he did not disclose they [*sic*] claim."

¶ 23    "It is within the discretion of the circuit court to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion." *Peach v. McGovern*, 2019 IL 123156, ¶ 25. The trial court correctly diagnosed the issue: whether the options had been disclosed. Discussions about presettlement negotiations regarding the disposition of Strong Suit were irrelevant to the question of whether Jeffrey told anyone about the existence of *his* options.

¶ 24    Further, we again find that this argument comes from the wrong perspective. As the evidence clearly showed, the options were issued to and held by Jeffrey, not Strong Suit. Presettlement negotiations regarding Strong Suit have no bearing on assets that belonged to Jeffrey. Even if the trial court were to have erroneously prohibited the admission of this evidence, the error would have been harmless. We find no error here.

¶ 25                                III. CONCLUSION

¶ 26    For these reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 27    Affirmed.

---

*In re Marriage of Hyman*, **2023 IL App (2d) 220041**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 14-D-2299; the Hon. Christopher Lombardo, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Eric J. Schwab, of Berger Schatz, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Matthew D. Elster, of Beermann LLP, of Chicago, for appellee. |

---